E. P. LIVINGSTON *against* D. LYNCH, Jun. and others.

In private associations of individuals, the majority cannot bind the minority, unless by special agreement.

The association of stockholders of the *North River Steam Boat Company*, is not a *copartnership;* but the parties are *tenants in common* of the property and franchises belonging to the company.

The *resolutions* passed at a meeting of the stockholders, by unanimous vote, on the 13th and 14th of *April*, 1817, and subscribed by all of them, are the *fundamental* articles, or *constitution* of the company, by which the former articles of agreement of the 26th *July*, 1814, were abrogated:—And they cannot be changed or altered but by the unanimous voice of all the stockholders. Therefore, certain *resolutions* passed the 5th *May*, 1819, not having been consented to by all the stockholders, and being repugnant to the *fundamental articles* of the association, are null and void.

*August 29th.*

BILL filed *July* 22d, 1819, against *Robert L. Livingston, the executors of R. Fulton, Dominick Lynch, Jun.* and others, stating, among other things, that on the 25th of *July*, 1814, the plaintiff, the defendant *R. L. Livingston*, and *R. Fulton*, since deceased, were sole proprietors of certain exclusive rights to navigate with steam, &c. secured by sundry patents from the *U. S.*, and by grants and acts of the legislatures of the different states, and particularly of this state, to *R. Fulton* and *R. R. Livingston*, deceased, whose heirs and assigns, the plaintiff, and the defendant *R. L. L.*, are owners of one undivided moiety thereof.

That with a view, amongst other things, to constitute a separate concern, as to so much of the said rights as respected the navigation by steam boats on the *Hudson* river, between the City of *New-York* and *Troy*, and the intermediate places, *R. F.* and the plaintiff, and the defendant, *R. L. L.*, on the 25th of *July*, 1814, entered into articles of agreement, under their hands and seals. This agreement, which was set forth in the bill, recited, that whereas the par-

1820.

LIVINGSTON v. LYNCH.

ties being proprietors and acting partners of and in the rights, privileges, &c. it was agreed that the rights, &c. on the *Hudson* river, between *New-York* and *Troy*, &c. and the boats, &c. should be a separate concern from their rights, &c. in other places; and should be divided into 1,640 shares, of 500 dollars each, one half of which were declared to be the property of *R. Fulton;* one fourth the property of the plaintiff, and one fourth of the defendant, *R. L. L.;* and the subscribers were to be at liberty to dispose of their shares, as they might deem proper. That *R. F.*, during his life, should have two voices in the management of the concern, as long as he continued to hold ten shares, and the other two one voice each, as long as they continued to hold five shares each, &c. That on the death of either of the parties, each heir or assign of the deceased, should have a voice in the concern, in proportion to the number of shares he or she should hold in the stock, each share being one voice, and then a majority of voices should govern the concern. But no heir or assign should have a control over the *Hudson* river concern, until the death of the contracting party from whom the share or shares held were derived, &c. And it was agreed, that the "duration of the *Hudson* river partnership be co-extensive with the grant from the state of *New-York.*"

The bill further stated, that under this agreement, the profits of the concern were paid by the masters of the boats, directly to the parties, according to their respective proportions. That *R. Fulton*, before his decease, assigned sundry shares in the *Hudson* river concern to the other defendants named. That on the 13th and 14th of *April*, 1817, at a meeting of the stockholders, a new organization was agreed on between them, and certain *resolutions*, in the nature of a new agreement, were adopted and signed by all the persons holding shares in the *Hudson* river concern, except some holders of shares to an inconsiderable amount, who acquiesced therein. The preamble to these *resolutions*

was as follows: "At a meeting of the stockholders of the *North* river steam boat company, held on the 13th, and continued by adjournment to the 14th of *April*, 1817, convened for the purpose of organizing the company, and of adopting such rules and regulations, as should be deemed advisable, for the well managing the concerns of the said company, the following named stockholders were present: viz." naming them, being the plaintiff and all the defendants, except nine. By these resolutions, thirty-two in number, the capital stock of the company was declared to be six hundred thousand dollars, divided into one thousand shares, of six hundred dollars each: the number of shares set opposite the name of each subscriber to the resolutions, to be deemed his shares on that day. A president, secretary, and clerk, were to be annually chosen, and their duties were prescribed. The third resolution, which gave the secretary a salary of one thousand dollars per annum, made it his duty to attend the meetings of the company, to keep a record of the proceedings, "to see that the resolutions of a majority of the interest of the concern be carried into effect;" keep a regular transfer book, &c. Monthly meetings of the company were to be held in the City of *New-York*, at which meetings the stockholders were to vote in person or by proxy. The masters of the boats were to deposit the whole amount of their receipts, on their arrival at *N. Y.*, in the *Manhattan Bank*, to the credit of the *North River Steam Boat Company*, and all drafts on the funds in the bank were to be signed by the clerk and countersigned by the secretary, &c. Various regulations for the conduct of the different officers, masters of the boats, &c. were prescribed, and their respective duties defined. The defendant, *R. L. L.*, was appointed president; the defendant, *Lynch*, secretary; and *A. N. Hoffman*, clerk, with a salary of 1,500 dollars, &c.

The bill further stated, that by this arrangement the name of the concern was changed to that of the "*North River Steam Boat Company*," the number and amount of shares

altered, and officers appointed. That the plaintiff waived a portion of his right under the articles of the 25th of *July*, 1814, with a view to place the concern on a permanent basis, so as to prevent collision, and especially, so as to secure the monies arising from the employment of the boats, from the hazard of perversion or loss. That under the agreement and resolutions of the 14th of *April*, 1817, the boats were kept employed, and the masters deposited the receipts respectively in the *Manhattan Bank*, and, afterwards, by the consent of the stockholders, in the *Bank of New-York*, to the credit of the *North River Steam Boat Company;* and the supplies, except such as were permitted by the masters to be made in cash, were procured by the clerk, and the monies drawn out by the check of the clerk, countersigned by the secretary, until the 5th of *May*, 1819.

The bill then charged, that the defendant, *D. Lynch*, acting as secretary of the company, on or about the 5th of *May*, 1819, under pretence of authority derived from the stockholders of the company, and under pretence that he had, as secretary, authority to carry into effect the resolutions of a majority of the stockholders, caused *A. N. Hoffman* to be dismissed from his office of clerk and purveyor for the boats, and assumed upon himself the entire management and control of the boats, &c. &c. That the said *D. L.* gave notice to the masters of the boats to pay to him the whole moneys, receipts, and earnings of the boats, or else, to deposit the same, subject to his order, in the *Bank of New-York*, to a new account; changing the name of the said company to that of *Hudson River Steam Boat Company*, to the credit of which name and account, he had directed the moneys to be deposited; subject to be drawn out by his own check; and had taken on himself exclusively, the right of furnishing supplies for the boats, and settling and paying all accounts, &c. thereby destroying all the checks against mismanagement, provided by the agreement and resolutions of the 14th of *April*, 1817. That the plain-

tiff, in consequence of these acts of *D. L.*, gave notice to the masters of the boats to retain and deposit in the *Manhattan Bank*, his proportion of the receipts, with intent to preserve his rights, until the resolutions of *April* 14, 1817, should be restored, or his rights under them enforced. That since such notice, *D. L.*, and others connected with him, had threatened the masters of the boats, that unless they paid over to *D. L.* the whole of the moneys received by them, including the proportion of the plaintiff, and conformed implicitly to his directions, they should be dismissed, and others appointed in their stead. That the said *D. L.*, in justification of his conduct, sent to the plaintiff a copy of certain resolutions, dated the 5th of *May*, 1819, signed by a number of the stockholders, and to which the secretary was requested to obtain the signatures of other stockholders, not present at the meeting. That the plaintiff wrote to *D. L.* disapproving of the resolutions, and of his conduct, and insisting on a strict compliance with the agreement and arrangement made by the resolutions of the 14th of *April*, 1817. That although by the resolutions of the 14th of *April*, 1817, the president and secretary were to be annually appointed, and *R. L. L.*, and *D. Lynch*, were then respectively appointed to those offices, the term of which expired in *April*, 1818, yet they had never been re-appointed, at any regular meeting of the stockholders, nor any other persons appointed in their places. That the resolutions purporting to be passed at a meeting of the stockholders on the 5th of *May*, 1819, were not proposed or submitted, at any monthly or regular meeting of the stockholders of the company, previous to the said 5th of *May*, for their consideration, nor was such meeting, on the 5th of *May*, one of the monthly meetings designated by the resolutions of the 14th of *April*, 1817. That a majority of the stockholders who subscribed to the resolutions of the 5th of *May*, 1819, were induced to do so by misrepresentations, and supposing that

1820.

LIVINGSTON v. LYNCH.

it was a matter of general arrangement and acquiescence. That the plaintiff, and a majority of the stockholders, had no notice of any intent to pass, or adopt such resolutions, until a copy of them was presented to them for their signatures; that these resolutions of the 5th of *May*, 1819, were entirely irregular and void; and the plaintiff insisted, that the resolutions of the 14th of *April*, 1817, are, notwithstanding the said resolutions of the 5th of *May*, 1819, in full force, and obligatory on the proprietors and stockholders; and that, by the true construction thereof, the fundamental articles of that agreement, which regard the permanent constitution and organization of the association, cannot be altered or changed, unless by the assent, in writing, of all the stockholders; at least, that no alteration thereof could be made, except by the vote of a *majority in interest*, of the stockholders, at a regular monthly meeting, and after the proposed alteration had been submitted at a previous regular monthly meeting, so that the same might be maturely considered, &c. &c.

The bill *prayed*, that the resolutions of the 5th of *May*, 1819, and any other resolutions and acts of the defendants, or any of them, inconsistent with his rights, and repugnant to the resolutions of the 13th and 14th of *April*, 1817, might be set aside, and declared null and void; and that the resolutions and agreement of the 13th and 14th of *April*, 1817, may be confirmed and established, and be carried into specific execution. That the several masters of the boats, in conformity thereto, may be directed to deposit the receipts and profits which may come into their hands, in the *Bank of New-York*, to the credit of the *North River Steam Boat Company*; that the said bank be enjoined from paying out the same, or any part thereof, except upon the draft or order of the clerk, countersigned by the secretary of the company. That the said *D. Lynch*, and his agents, be enjoined from acting under, or in pretence of the resolutions of the 5th of *May*, 1819, and from receiving any moneys from the mas-

ters of the boats, &c. or from drawing out, or otherwise obtaining or receiving any moneys belonging to the said company, from the *Bank of New-York*, except upon the checks or drafts of the clerk, countersigned by the secretary; and that *D. L.* be enjoined from displacing, or removing, or attempting to displace or remove, any of the masters of the said boats, or any of them, or otherwise interfering with their duties, except when duly authorized to do so, pursuant to the resolutions of the 14th of *April*, 1817. Or, in case those resolutions have, in any way, been waived or rescinded, then, that the plaintiff's rights, under the articles of agreement of the 25th of *July*, 1814, may be established and declared, and that the plaintiff be permitted, thereunder, to receive directly from the masters, his proportion of the moneys, which shall be received by them, deducting his proportion of the expenses; and that the said *D. L.* be restrained from exacting and receiving, and the said masters from paying to him, or to his order, such proportion of the plaintiff. And that the masters of the boats, or such of them as it shall appear to concern, may come to an account with, and pay over to the plaintiff, any moneys which may appear to belong to him, &c. And for general relief, &c.

The bill was taken *pro confesso*, against *R. L. Livingston* and *Cornelia Juhel*. The other defendants appeared, and answered, and general replications having been filed, and testimony taken, the cause came on to be heard on the pleadings and proofs.

*Slosson*, for the plaintiff, contended, 1. That the stockholders of the company, being tenants in common of the property and franchises belonging to them, the assent of all of them to the agreement and ressolutions of *April*, 1817, was necessary. Independent of any agreement, each tenant in common has the entire dominion over his own share

or proportion, and neither of them can do any act to bind or regulate the interest of the others without his assent. *Kyd*, (*on Corp. vol.* 2. *p.* 95. *chap.* 3. *sect.* 10.) says, "there are some societies which are formed by the voluntary association of the members: and there are communities which have a known description, and are recognized as forming part of the general constitution of the country: the former must have their rules or by-laws as well as the latter; but they receive no aid from the general law of the land to enforce obedience to their rules, and they have no ultimate remedy against disobedience, but the expulsion of the disobedient member." This doctrine was fully recognised by Lord *Eldon*, in *Lloyd* v. *Loaring*, (6 *Vesey*, 773. 777.) That was a case between the members of a society of *Freemasons*. "If I consider them," says Lord *Eldon*, "as individuals, the majority had no right to bind the minority. One individual has as good a right to possess the property as any other, unless he can be affected by some agreement." *Abbot*, (*on Ships*, *part* 1. *ch.* 3. *sec.* 2.) says, "a personal chattel, vested in distinct proprietors, cannot possibly be enjoyed advantageously by all, without a common consent and agreement among them: to regulate their enjoyments, in case of disagreement, is one of the hardest tasks in legislation; and it is not without wisdom, that the law of *England*, in general, declines to interfere in their disputes, leaving it to themselves, either to enjoy their common property by agreement, or to suffer it to remain unenjoyed, or to perish by their dissension, as the best method of forcing them to a common consent, for their common benefit." In the *Chamberlain of London's Case*, (5 *Co.* 63.) it was held, that the inhabitants of a *town*, which comes within the distinction of *Kyd*, "as a community of known description recognized by law, might make ordinances or by-laws for the reparation of the church, or a highway, or of any such thing, which is for the general good of the public; and, in such case, a greater part shall bind the whole, without

any custom; but if it be for their private profit, as the well ordering of their common of pasture, or the like, there, without a custom, they cannot make by-laws: and if there be a custom, then the greater part shall not bind the less, if it be not warranted by the custom." Such is the uniform language of the books. The majority cannot make by-laws, or pass resolutions binding on the minority, unless there be some special agreement, or custom, or grant from the legislature, for that purpose. Lord *Eldon*, (6 *Vesey*, 778.) says, the Court would take notice of the joint interest of individuals in a chattel, and of agreements upon it, not with reference to them as a voluntary society, but as individuals. Referring to the case of *Fells* v. *Read*, (3 *Vesey*, 70.) he observed, that it was the duty of Courts, not to permit a voluntary society to assume the character of a corporation on the record.

The only exceptions to this general rule, that the majority cannot bind the minority, without a special agreement, are the cases of a *partnership*, where the interest is *joint*, not in common, and of the part owners of a ship. In the former case, the principle is not that a majority can bind the minority, but that each partner, having a joint interest in the whole concern, may bind all the partners. The case of ships rests on peculiar grounds; it being a rule of maritime law, founded in public policy, that ships are built "to plough the ocean, and not to rot by the wall." And the nature of the enjoyment of the common property in ships, shows the distinction in regard to other cases. If all do not agree to send the ship on a voyage, the dissentient part owner is not obliged to share in the risk of the adventure, nor will he participate in the profit of it. He may require the other part owners to give security for his interest. But even in this case, if there is a settled agreement among them, as to the employment of the ship, the majority cannot control, but the agreement is to be enforced, as in all other cases, according to the rules of law. (*Abbot, ubi supra.*)

1820.

Livingston v. Lynch.

2. The resolutions of *April*, 1817, which were unanimously agreed to by the stockholders, and which form, the fundamental articles or constitution of the company, cannot be altered, without the like unanimous consent, or in the mode prescribed by those resolutions. It is expressly provided, that there shall be monthly meetings; and that it shall be the duty of the secretary to see that the resolutions of the majority in interest in the concern, be carried into effect. But any number of stockholders less than the whole, cannot alter, or rescind those *fundamental* articles of association. The express assent of the whole was necessary to their formation; and it is only by a like assent that they can be changed. *Solvitur eo ligamine quo ligatur.* A power may, undoubtedly, be given by express agreement, to a majority to bind the minority, and this Court would enforce such an agreement; but such a power must be clearly shown and established, for it is in derogation of the legal and natural rights of the minority. Such an agreement, however, is not to be enforced on the ground of a right in the majority to bind the minority, but as an agreement merely of the whole, the minority being considered as having assented to, and become parties to the new resolutions formed pursuant to the fundamental articles.

If such a power exists in a majority to alter or rescind the resolutions of *April*, 1817, it must either be given in express terms, or result, irresistibly, from the nature of the agreement. The only resolution which at all adverts to such a power, is the *third*, which has been mentioned. That manifestly refers only to such directions or resolutions of the majority of the concern, as shall be made at the regular monthly meetings acting under the constitution of the company. The preamble to the resolutions of *April*, 1817, shows, that they were made for the organization of the company. The acts done at any monthly meeting, must be under the constitution. It would be absurd to suppose, that a majority

at a monthly meeting, could abolish the office of secretary, and yet, that the secretary must carry that resolution into effect.

Nor does the 31st resolution give such a power. It provides, "that all propositions for an alteration of the resolutions of the company shall be submitted at one of the monthly meetings, and shall not be acted on until the next monthly meeting." It does not, in terms, give the majority any power to alter or rescind the resolutions; and unless *expressly* given, the power cannot be claimed or exercised. But it is obvious, that this resolution was intended merely to guard against precipitancy in the proceedings of the company, and to give each individual time for deliberation on the expediency of any such proposition, before he was called upon to vote upon it. That the defendants themselves understood that no alteration could be made without the assent of all the partners in interest, is evident from the letters of *D. L.* to the plaintiff. Such was the opinion not only of Lord *Eldon*, but of the Court of K. B., in the case of *Davies* v. *Hawkins*, (3 *Maule & Selwyn*, 488.) There was an association of 600 persons, who made subscriptions in shares, for the establishment of a *brewery*, and the subscribers entered into an agreement by deed, for the management of the concern, one of the terms of which was, that the conduct of the business should be confined to two persons, styled *brewers*, who were to carry on the trade in their own names, as trustees, &c. A committee was appointed, with full powers to make by-laws, &c. subject to the confirmation of a majority of the proprietors, at a quarterly meeting. At such quarterly meeting, on the recommendation of the directors who had power to regulate the general affairs and business of the company, *one* only, instead of *two*, was appointed to conduct the business as brewer. The Court held, that this could not be done, as it was an alteration in the constitu-

1820.

LIVINGSTON v. LYNCH.

tion of the company, which could not be made without the consent of the whole body of subscribers.

3. But, in any event, the resolutions of the 5th of *May*, 1819, were irregular and void, since the 31st resolution of *April*, 1817, required, that all propositions for any alteration should be made at a monthly meeting, and not be acted upon until a subsequent monthly meeting. The meeting at which those resolutions were passed, was not a monthly meeting, nor were a majority in interest of the stockholders, present.

*T. A. Emmet* contra, contended, that the agreement of the 25th *July*, 1814, was the constitution of the association, so far as regarded the *North* River concern. That agreement recites that the parties are *partners*. They are not, therefore, to be regarded as tenants in common. The rights are divided into 1640 shares, and apportioned to each of the proprietors. The *second* article of the agreement provides for the event which gave rise to the present association. In case of the death of either of the contracting parties, each heir or assign (and those who purchased of *F.* are the assigns) of the deceased, were to have one voice, for each share owned by him; and "then a majority of the voices shall govern the concern." Previous, then, to the resolutions of *April*, 1817, the plaintiff, by an instrument under his hand and seal, recognised himself as a *partner*, and stipulated that the concern should, in every thing, be governed by a majority of shares. Those, therefore, who afterwards bought rights of *F.* purchased also, the valuable privilege, that the majority of shares should govern. This was a *fundamental* article of the association, and adopted with a view to the subseqent disposition of the shares by the Messrs. *L's.* & *F.* and the plaintiff must be bound by it, until he can induce all the stockholders to change it, *eo ligamine quo ligatur*. The parties met in *April*, 1817, under this previously established rule and compact that the majority of shares should govern; and the resolutions were

passed as the act of a majority, and derived their strength and binding force from their being an act of the majority. If, then, a majority in interest had a right to make these resolutions, such majority had a right to alter or annul them, or any one of them, and to substitute others. The authorities, therefore, which have been cited, do not apply to this case, for the right of the majority to govern was previously established as a fundamental article of the association; and, in fact, the course of proceeding adopted by the defendants, has been sanctioned by the agreement of all parties. The constitution or basis of the association is the agreement of the 25th *July*, 1814. The resolutions of *April*, 1817, are in the nature of *by-laws*, for the better management of the business, and might be altered, from time to time, to suit the business, by the whole or by a majority in interest of the stockholders, either at a monthly meeting or in any other way, clearly showing the deliberate consent of a majority; and, therefore, since the discontinuance of these meetings, by meetings not monthly, or by written resolutions signed by a majority in interest. The plaintiff, by his agreement of *July*, 1814, was bound to abide by the regulations prescribed by a majority in interest of the stockholders, when their will was clearly expressed and ascertained; and he cannot be heard in this Court to claim rights in opposition to his solemn agreement.

But the "act to incorporate the *North River Steam Boat Company*," passed the 10th *March* last, renders any further discussion unnecessary; for this Court cannot admit the allegation of the plaintiff, that he is not a corporator, because he has not assented to the act of incorporation, and refuses to become a party to it. The act expressly declares, that all persons who then were, or at any time thereafter might be stockholders of the *North River Steam Boat Company*, should be, thereby incorporated. (*a*)

(*a*) While this suit was pending, the defendants applied to the legislature, and obtained an act incorporating the company; but the

1820. LIVINGSTON v. LYNCH.

To decide on the character of the resolutions of *April*, 1817, it is necessary to consider the distinction between a constitution and a by-law. Constitutions are agreements under which states or persons, having no previous bond of union, associate or unite, either for government, protection, or acquisition of property. The acts which they adopt for their guidance and management, afterwards, are called laws and by-laws; the former for states, the latter for individuals. The parties in this cause, as the bill stated, were previously united, constituted or connected by an agreement binding on the plaintiff, and on all the parties having interests in the subject matter, not derived, as to any of the defendants, from the plaintiff. These resolutions did not constitute the parties proprietors, for they were already such. They merely prescribed, as the *preamble* to them says, "such rules and regulations as were deemed advisable for the well managing the concerns of the said company;" that is, they are by-laws for the management of the joint property, and there is not one of the resolutions that is entitled to be called a *fundamental* article. That they are merely by-laws, is apparent from the 3d and 31st resolutions, admitting the right of a majority to govern and alter under the agree-

plaintiff refused to join in the application, or to become a corporator. The seventh section of the act (*sess.* 43. *ch.* 84.) provides: "That if the rights, powers and privileges of the respective proprietors or stockholders of the *Steam Boats* employed in the navigation of the *Hudson* River, as at present possessed and exercised, in pursuance of any agreement, contract, or authority whatever, are not continued and secured to them by by-laws, or otherwise, as fully under this incorporation, as they are entitled thereto before the passing of this act, it shall and may be lawful for the party aggrieved to make application to the *Chancellor*, who shall have power and authority to order the Directors of this incorporation to carry the requisitions of this section into effect: and in case they shall refuse so to do, the *Chancellor* shall have power and authority to declare this act null and void; and thenceforth this law shall be taken and deemed to be null and void."

ment of the 25th *July*, 1814, and pointing out the mode in which alterations were to be made. If, then, those resolutions are by-laws, and if, according to the third article, a majority are to govern, the resolutions of the 5th *May*, 1819, are legal and binding, for they have been approved or signed by all the stockholders, except the plaintiff. But it is said that these resolutions were not passed at a regular monthly meeting, pursuant to the 31st resolution of *April*, 1817. It appears to have been the intention to have held regular monthly meetings according to that resolution, and to have submitted all matters previous to voting on them; but it appears, also, from the answers of the defendants, and the evidence of Mr. *Hoffman*, that these monthly meetings being found inconvenient and impracticable, were, by general consent, discontinued after *July*, 1817; and the business of the company, by common consent, has since been transacted, either at meetings specially called for the purpose, or by written resolutions prepared by persons proposing them, and transmitted to all the stockholders. The bill admits that changes have been made in this way. The second and third resolutions, after the first meeting, were never acted upon, and the officers held over to the time of the act of incorporation; and the plaintiff has approved of it, by various ways, by receiving dividends, and attending subsequent meetings, &c. *Hoffman*, in his testimony, states a number of alterations of the resolutions of *April*, 1817, not proposed or made at any regular monthly meeting; and at most of those meetings the plaintiff was present and assenting. The plaintiff ought not, therefore, to be allowed to object to the resolutions of *May*, 1819, on the ground that they were not prepared at a regular monthly meeting: 1. Because, he has concurred in the discontinuance of those monthly meetings, and in the mode substituted for the transaction of business, and is bound by his agreement to submit to the will of the majority, so declared and ascertained: 2. Because, in his letter of the 10th *May*, he did

1820.

LIVINGSTON v. LYNCH.

not make that a ground of objection, and did not state it, until the filing of his bill: 3. Because, he has approved of part of the resolution of *May*, 1819, and has thereby waived any right he may have had to make the objection. It is said, that the 31st resolution of *April*, 1817, is fundamental, because it secured mature deliberation and reflection on all measures proposed. Does not the mode of submitting propositions to each stockholder, in the form of written resolutions, for his consideration, equally, or in a greater degree, secure deliberation and reflection? The resolutions of *May*, 1819, embraced three points: 1. The removal of *Hoffman* as clerk and purveyor: 2. The demanding and receiving from the captains of the boats, an assignment of the contract for conveying the mail: 3. Requiring from *Hoffman* & *Van Buren* payment of the balance due from them. It is to the *first* only of these alterations, that the plaintiff has objected. How can the removal of this individual be a violation of the fundamental articles of the association? The counsel here went into an examination of the facts, and a particular discussion of the different resolutions, and of the conduct of the parties.

*Wells*, in reply, said, that the assertion that the parties were *partners*, not tenants in common, was unfounded. The use of the word "partners," in the preamble to the resolutions, did not make them so. Besides, if they were partners, how do all those defendants who claim as purchasers under the late Mr. *Fulton*, make title to their shares? If it was a partnership property, the whole of the interest of *F.* survived to the plaintiff and *R. L. L.* But it is manifest that the word "partners" is used accidentally and inartificially, as meaning only, that they were interested and acting together in a common concern. The use of the words cannot alter the intrinsic nature of the property, or the tenure by which it was held.

Instead of denying the conclusion of the opening counsel, he defendant's counsel deny his premises. They deny

that the resolutions of *April*, 1817, were the constitution, or fundamental articles of the association; and they go back to the agreement of *July*, 1814, which they denominate the constitution; and treat the resolutions of *April*, 1817, as mere by-laws. The principal object of the agreement of *July* 1814, was to regulate the enjoyment of the property during the joint lives of the owners. When, in the event of the death of one of the parties, a majority of the stockholders was to govern, it was obviously intended that they were to govern by some new rules, not to be found in an instrument applicable only to the original proprietors, and not intended to govern the rights and interests of persons newly added to the old remaining proprietors. Accordingly, after the death of *F.* neither the surviving proprietors, nor the defendants claiming under him, thought of regulating their concerns by the agreement of *July*, 1814. They met on the 13th and 14th *April*, 1817, "for the purpose of *organizing* the company, and adopting such rules and regulations as should be deemed advisable for the well managing of its concerns." An entire new agreement was formed and substituted, the number of shares was reduced, the price of them altered; a new stock was created, in which each owner is put on an equality in proportion to his interest. A mode of transfer is prescribed, and each purchaser is to succeed to the rights of the original owner, &c. The whole scope of the resolutions of *April*, 1817, shows clearly the intention to abrogate all prior agreements, by an entire new organization, placing each proprietor on the equal footing of a tenant in common, and to form a bond of union, in the future management of their common interests. All the parties treated it as an establishment then first formed, and the resolutions are not of a society already organized, but of one organizing itself. The plaintiff, on entering into this new compact, voluntarily surrendered powers guaranteed to him by the agreement of *July*, 1814, with a view to conciliation, and in consideration of the new compact offered in their stead.

1820.

LIVINGSTON v. LYNCH.

Besides, not one of the defendants, except, perhaps, the counsel himself, pretends ever to have seen the agreement of *July*, 1814, or to be acquainted with it: nor does the counsel regard it as fundamental, or the constitution, on which his rights are founded. He claims nothing under it, though he admits its existence: a majority of the defendants, in their answers, insist, that the articles of *July*, 1814, "are not binding or obligatory upon them and the other stockholders, further than they are recognised in, and adopted by, the resolutions of the 13th and 14th *April*, 1817." Now, the articles of *July*, 1814, are no where mentioned or referred to in the resolutions of *April*, 1817. Several of the other defendants, in their answers, insist, "that by the resolutions of the 13th *April*, 1817, the articles of agreement of *July*, 1814, if any such existed relative to the *Steam Boat* concern on the *Hudson* River, were wholly abrogated, and rendered null and inoperative, and could in no wise bind or affect any of the proprietors of the new association formed on the 13th and 14th *April*, 1817." It is idle, then, in the face of these answers, to argue that an agreement, which they insist is abrogated, and inoperative, is the constitution by which their rights are to be ascertained and secured. But it is said that these resolutions are mere by-laws. But what did the parties mean when they declare that they met on the 13th and 14th *April*, 1817, for the purpose of "*organising* the company," and making "rules and regulations," for the well managing of its concerns? Much stress is laid on the third resolution, as to the secretary being directed to carry into effect the resolutions of a majority in interest, and in reference to the agreement of *July*, 1814. But the resolutions themselves contain no reference to that agreement. At most, the third resolution could only mean such resolutions as the majority might lawfully and rightfully pass, according to the constitution of the company. Nothing was said at the meeting about a majority. The resolutions were signed by all the stockholders, who affixed to their names the

number of shares owned by them, thereby expressing the consent of each individual to this original compact of their association. This being established, it follows, that no alteration can be made in any of these fundamental resolutions, without the consent of every stockholder, and this general principle rests on the common law doctrine as to tenants in common.

But, it is said, that the plaintiff cannot now object to the resolutions of *May*, 1819, because he had acquiesced in the discontinuance of the regular monthly meetings, and did not make his objection before filing his bill, and because, by assenting to a part of those resolutions, he has waived his right to object. Persons acting together in any particular business, may, in some instances, from negligence or ignorance, suffer their affairs to be irregularly conducted, but, though bound as to what is past, they have a right to stop, at any time, refuse to countenance further irregularity, insist on correcting their errors, and on bringing themselves and their associates back to the strict observance of the original and fundamental rules of their association. It is a dictate of good sense, and that practical wisdom which the law approves. The counsel next discussed various grounds of altercation between the parties, and vindicated the conduct of the plaintiff, in the support of his legal and just rights.

THE CHANCELLOR. The object of the bill is to reinstate the plaintiff in certain rights which he claims under the resolutions of the 13th and 14th of *April*, 1817, relative to the appointment and removal of certain officers belonging to the *North River Steam Boat Company*, and relative to the security and distribution of the funds, and the general management of the concern.

The great point is, whether the resolutions of the 13th and 14th of *April*, were to be regarded as fundamental articles, or the constitution of the company, requiring the unanimous consent of all the members of the company, to

1820. LIVINGSTON v. LYNCH.

alter, as well as to establish them, or whether they were to be regarded merely as by-laws, subject to the control of a majority in interest of the association. On the solution of this point depends the validity of the resolutions of the 5th of *May*, 1819, of which the plaintiff complains.

It appears to me most clearly, that the association is not, in judgment of law, a partnership with either the rights or responsibilities belonging to that commercial relation. If that were the case, each member would have a joint interest in the whole partnership stock and concern, and could aliene or bind the whole interest. One partner may pledge the credit of the others to any amount, and each partner commits his entire rights to the discretion of each of his copartners. There is no colour for this conclusion in this case. The evident character of the members of the company is that of tenants in common, in which each has a distinct, though undivided interest in the establishment, and an entire dominion over his own share or proportion of the property; but without any of right or power to bind the interest, or regulate the enjoyment of the property of the other members. The resolutions of the 13th and 14th of *April*, derived their binding force and obligation upon all the members of the company, from the fact that they were agreed to and signed by all. The members met, and acted on that occasion as independent tenants in common; and from the nature and language of those resolutions, it is quite apparent they were intended to be permanent regulations for the future government of the company, and not subject to alteration, but by the same united will by which they were ordained.

The three persons owning, in 1814, the steam boat property and franchises on the *Hudson* river, were not partners under the articles of agreement of the 25th of *July* of that year. They never intended to subject themselves individually, to the risks, and to the alarming powers given to each member of a partnership, by the policy of commercial law.

1820.

LIVINGSTON v. LYNCH.

They treated with each other, and acted in that case, in the regulation of their interest, as tenants in common. Though they speak of themselves as "the sole proprietors and acting partners" in the steam boat rights and privileges, and of the *Hudson* river establishment as a "partnership," yet, it is evident, that they used the terms *partner* and *partnership*, in some popular, not in a legal or technical sense, and without meaning to attach to their association any one quality or mark of a partnership. By those articles, the number of shares belonging to each member was ascertained, and it was added, that he might "dispose of any number of said shares *he may possess*, that he should think proper; but if he should part with the whole of his shares, he should, from that time, cease to have any further management in the *Hudson* river concern." This was declaring the true character and interest of a tenant in common. So, the provision that the shares of each of those members should, on his death, descend to his heirs, was founded entirely upon the contemplation of a tenancy in common. This agreement of 1814, regulated the amount and distribution of the capital, and the number of votes each member was to have during the joint lives of the contracting parties, and the variation that was to take place on the death of either of them, when the heirs or assignees came to vote; and it provided, that *a majority of voices should then govern the concern;* But how govern it? Certainly not in violation of those permanent provisions establishing the amount of shares in the *North River Steam Boat* navigation, as a distinct and separate concern, and providing, after the admission of the heirs or assignees of a party who may have died, that the surviving contracting parties should be considered equal to as many votes as he had shares allotted to him by the agreement. It is evident, that the majority of voices was to govern only in respect to the administration of the business of the concern under

1820.
LIVINGSTON
v.
LYNCH.

this agreement; and the provision was intended to dispense with the inconvenience of requiring, on every occasion, the consent of every member. The resolution of the majority, in pursuance of such a fundamental provision, stands for the will of the whole, it being the will of the whole that the majority should govern in such cases.

If, therefore, we were to recur to the agreement of 1814, for light or assistance in the construction of the resolutions of 1817, it would not afford any strength to the pretensions of the defendants under those resolutions. But, in fact, there is not any relation or connection between the two agreements; and the defendants, in their answers, have rested their rights entirely upon the resolutions of 1817.

The defendants, *R. L. Livingston* and *Cornelia Juhel*, have suffered the bill to be taken *pro confesso;* and they, with the plaintiff, own a majority of interest in the whole concern; that majority, therefore, either contend or admit that the resolutions of *April*, 1814, were a new organization of the company, and composed a new constitution for its future government. Most of the defendants who have answered the bill must have formed the same conclusion, for they deny any knowledge, other than what is given by the bill, of the agreement of 1814, and they insist that it is "not binding or obligatory upon the company, further than the same is recognized and adopted by the resolutions of 1817." Nay, several of the defendants insist, that by the adoption of the resolutions of *April*, 1817, "the articles of agreement before that time existing between the three parties to those of 1814, relative to the steam boat concern, were wholly abrogated, and rendered null and inoperative, and could, therefore, in no way bind or affect any of the proprietors in the *new association* formed in *April*, 1817."

The resolutions of 1817 purport, upon the very face of them, by their language, by the whole detail of the provisions, and by the unanimity required and given, to have been fundamental articles, or the constitution of the compa-

ny. Every distinguishing character of the former association was destroyed. It was a meeting of the stockholders "convened for the purpose of organizing the company, and of adopting rules and regulations for the well managing the concerns of the said company." The capital stock, under the former establishment, was reduced, a new stock created, and the number of shares designated into which it was to be divided. There was to be an annual president, to preside at all meetings, and a secretary, to be annually chosen, with a declared salary, and whose duties were prescribed. There was to be a clerk, whose duties were also prescribed. The monthly meetings were regulated; and at such meetings, the absent stockholders might be represented by proxy or attorney. The captains of the steam boats were directed where to deposit their moneys, and the mode of drawing and distributing the funds was specially provided. The general duties of the captains were also particularly noticed, and all the officers of the company were appointed by name, and their compensation fixed. And it was finally provided, that all propositions for an alteration of any of the resolutions of the company, were to be submitted at one of the monthly meetings, and not to be acted on until the next meeting.

I think there cannot be a doubt upon any mind, after perusing these articles, and connecting them with the admissions in the answers, that they are of the character and authority of permanent constitutional provisions, binding upon all the members, when adopted by all, as a solemn private contract; and that they can only be abolished by the like concurrent will by which they were adopted. If these are not of the nature, and do not partake of the force of fundamental articles, it is not in the power of any private association to have any. None can be drawn more essentially specific in their details, or more stable and directory in their views. When it is declared in one of these resolutions, prescribing the duties of the secretary, that he was "to see that

1820.

LIVINGSTON v. LYNCH.

the resolutions of a majority of the interest of the concern be carried into effect," it certainly could have referred only to resolutions passed in the ordinary transactions of the concern, and in perfect subordination to all and each of these articles of the original compact. We are not to intend, without express words, that each of these tenants in common, especially where the interests were so unequal and so momentous, surrendered his invaluable right, founded on settled principles of law, not to be controlled in the government of his individual interest, without his consent.

The general principle of law is, that in such private associations, the majority cannot bind the minority, unless it be by special agreement.

Lord *Coke* (*Co. Litt.* 181. b.) took the distinction between public and private associations, and admitted, that in matters of public concern, the voice of the majority should govern, because it was for the public good, and the power was to be more favourably expounded than when it was created for private purposes. In *Viner*, (tit. *Authority* B.) we have several cases marking the same distinction; and it is now well settled, that in matters of mere private confidence, or personal trust or benefit, the majority cannot conclude the minority; but where the power is of a public or general nature, the voice of the majority will control, on grounds of public convenience; and this is, also, part of the law of corporations. (*Attorney General* v. *Davy*, 2 *Atk.* 212. *The King* v. *Beeston*, 3 *Term Rep.* 592. *Withnell* v. *Gartham*, 6 *Term Rep.* 388. *Grindley* v. *Barker*, 1 *Bos. & Pull.* 229. *Green* v. *Miller*, 6 *Johns. Rep.* 39. 5 *Co.* 63. *a.*) In *Lloyd* v. *Loaring*, (6 *Vesey*, 773.) there was a suit by three persons, on behalf of themselves and all the other members of a lodge of free masons, and Lord *Eldon* observed, "that if he considered them as individuals, the majority had no right to bind the minority. One individual has as good a right to possess the property as any other, unless he can be affected by some agreement." Mr.

*Abbott* (*Law of Shipping*, part 1. ch. 3. s. 2.) admits the extreme inconvenience, under the law of *England*, of enjoying personal chattels vested in several distinct proprietors, without a common consent and agreement among them.

But the case most applicable to the one before us, is that of *Davies* v. *Hawkins*. (3 *Maule & Selw.* 488.) A company was formed for brewing ale, and by deed they confided the conduct of the business to two persons who were to be trustees of the company. General quarterly meetings of the company were to be held. It was resolved by the K. B., that one person only could not be appointed at a general quarterly meeting, in place of the two originally appointed under the deed, unless such alteration was made by the consent of all the subscribers. Lord *Ellenborough* said, that "a change had been made in the *constitution* of this company, which could not be made without the consent of *the whole body of the subscribers*. It was such a substituted alteration in its constitution, as required the assent of all."

The resolutions of the 5th of *May*, 1819, were irregularly passed, even assuming them to have been passed by a majority. There was not a majority of the stockholders in interest present on that day, nor was the meeting a regular one, according to the constitution of the company. Though the resolutions may have been signed by a majority in interest, (which, however, does not appear,) the signatures or assent of members were obtained separately, in detail, and not given by them in their collective capacity. They had not the advantage of mutual discussion; and all the checks provided by the resolutions of 1817, against abuse, and to ensure mature deliberation, were prostrated. It was an extremely precipitate proceeding, and to make out the assent of even a majority in interest, the defendants refer to a letter of one of the stockholders, as amounting to such assent. It would be impossible to afford sanction to the resolutions of the 5th of *May*, upon any known principle of law, or

1820. Livingston v. Lynch.

with due regard to the rights of property, or to the binding nature of a solemn private association and compact, having great interests under its care. The meeting which passed, or the members who signed those resolutions, seemed to be sensible, that the alterations they made in the permanent organization of the company, ought not to be left to rest upon the declared will of a majority, for "the signatures of all the stockholders was to be solicited."

Nor does there appear to have been the requisite subsequent ratification of the alterations of *May*, 1819. The plaintiff has given no such ratification; and though acts may have been agreed to by all not strictly within the scope of the resolutions of 1817, those acts were only a waiver, for the particular occasion or purpose producing them; and every member of the company has a right to recur, when he pleases, to his rights as they were secured by the fundamental articles of the association. It is not perceived, however, that any act, on any occasion, has been unanimously assented to, affecting materially the constitution of the company.

In short, there is no just foundation for the doctrine, that the articles of 1817 could be controlled or abolished by the will of a part of the association. If any one article might be abolished by a vote of the majority, so might every other article; and the rights and property of each individual member would be placed in the utmost jeopardy, at the control of others, without any security from compact, or the dictates of his own judgment. The law gives no such control to others over one's own property, or undivided interest, except in the case of partnerships, and of ship owners, which stand on peculiar grounds of commercial and maritime policy; and, even in those cases, there is particular protection provided for the dissenting owner.

I shall, therefore, declare, in this case, that the resolutions of 1817 are valid and binding, until altered by unanimous consent; and that the resolutions of *May*, 1819, are

void; and that the plaintiff is entitled to have the rights of the association replaced on their former basis.

The following decree was entered:

Decree.

"It is *declared*, that the parties to this suit forming the association in the pleadings mentioned, are tenants in common, having distinct but undivided interests in the property and franchises belonging to the company; and that they have neither the rights nor responsibilities of partners, and no member has power, as a tenant in common, to dispose of any interest except his own, or to bind the association by his contracts. And it is further declared, that the resolutions in the pleadings mentioned, and stated to have been passed on the 13th and 19th of *April*, 1817, are the fundamental articles, or constitution of the company, passed by their unanimous voice, and requiring, upon established principles of law, the like unanimous voice to alter or repeal them; and that the articles of agreement of the 26th of *July*, 1814, are not obligatory upon the company, and were abrogated by the adoption of the resolutions of *April*, 1817, and so it is admitted generally, by the defendants in this suit. And it is further declared, that the resolution which directs the secretary of the company to see that the resolutions of a majority in interest of the concern be carried into effect, has reference to resolutions passed under the authority of, and in conformity to, the provisions contained in the said articles of the 13th and 14th of *April*, 1817, and not to resolutions altering the same, or any part thereof. And it is further declared, that the resolutions in the pleadings mentioned, and purporting to have been passed on the 5th of *May*, 1819, being repugnant to some of the provisions of the said fundamental articles, and not having received the assent of all the members of the company as was intended in and by the same, and as was required by the rights belonging to each member, are null and void, and of no force or obligation upon the said company; and that any acts of

1820.
LIVINGSTON v. LYNCH.

all the company, in any particular case, contrary to the provisions of the said fundamental articles, if any such there be, do not alter the force or obligation of the said articles, or the rights of the members of the company under them, in any other case in which the like unanimous consent may not have been given. And it is further declared, that the said resolutions of the 13th and 14th of *April*, 1817, and every part thereof, continue to be obligatory upon the company, and ought to be carried into specific execution, in every respect in which the same have not been or may not be altered or varied by the unanimous consent of the said company duly declared. It is accordingly *ordered, adjudged, and decreed*, that the said resolutions of the 13th and 14th of *April*, 1817, are binding upon the said company, being the parties to this suit, until changed or repealed by unanimous consent as aforesaid, and that the said resolutions of the 5th of *May*, 1819, are null and void; and that the said resolutions of *April*, 1817, be carried into specific execution, as to the deposit of moneys, and as to the drafts of those moneys, and as to the appointment and duties of the clerk, and in all other respects, unless they shall have altered or may alter the same in cases wherein they do not conform thereto, by unanimous consent as aforesaid; and that the injunction heretofore issued be continued, and the receiver heretofore appointed be continued, until the said company shall have so conformed to the said resolutions of the 13th and 14th of *April*, 1817, as aforesaid, with the exception as aforesaid. And it is further *ordered, adjudged, and decreed*, in pursuance of the provisions of the statute of the 10th of *March*, 1820, entitled, "an act to incorporate the *North River Steam Boat Company*," that the rights, powers, and privileges of the plaintiffs, and of each proprietor or stockholder in the company aforesaid, under the said agreement of the 13th and 14th of *April*, 1817, as above declared, be continued and secured to them, until changed or repealed by unanimous consent as aforesaid, whether the said association shall act as a private com-

pany, or as a corporate body under the said statute. And it is further *ordered, adjudged, and decreed,* that the defendant pay to the plaintiff his costs of this suit, to be taxed, and to be paid as well by the defendants who have answered, as by those who have suffered the bill to be taken *pro confesso,* and to be paid rateably, in proportion to their respective interest and shares, relatively to each other, in the said company."