The following opinion of the Hon. MILO L. BENNETT, which was delivered by him in February, 1851, while setting as the chancellor of the third judicial circuit, was published in a pamphlet soon after it was delivered. The decision, in support of which the opinion was given, was acquiesced in, and the questions involved in it did not, therefore, undergo the revision of a higher tribunal; but both the decision and the opinion have been frequently cited with approbation, and a desire has been expressed by several members of the profession for its publication in a more durable form. Moreover the pamphlet, of which but a very limited edition was published, has long since been out of print, and its publisher has been unable to answer the frequent calls which have been made upon him for it. For these reasons it has been thought advisable to republish it, by the permission of the chancellor, as an appendix to the present volume.

## IN CHANCERY; CHITTENDEN COUNTY.

### BYRON STEVENS v. THE RUTLAND AND BURLINGTON RAILROAD COMPANY AND OTHERS.

#### *Corporation.*

A corporation, created for the purpose of constructing a railroad between certain termini, enjoined from using the funds obtained for that purpose or from pledging their credit for the purpose of extending their road beyond those termini.

In this case the R. & B. R. Company were incorporated by an act of the legislature, passed in 1843, for the purpose of building a railroad " from some point at Burlington, thence southwardly through the counties of Addison, Rutland, and Windsor or Windham to some point on the west bank of Connecticut River." This road they constructed in accordance with the provisions of their charter, and

36

the legislature then (in 1850,) passed an additional act authorizing them to extend their road "from their present terminus in Burlington, northwardly" &c. "to any point or points in the town of Swanton in the county of Franklin," which act the company voted to accept as an amendment to their charter and were proceeding to carry out its purpose. To this amendment, and to the acceptance of it by a majority of the stockholders, and to the proposed action of the corporation under it, the complainant, who had previously become a member of the corporation by subscribing and paying for five shares of its capital stock, did not assent, and brought his bill in chancery to enjoin the company from building the proposed extension. *Held*, that the proposed extension of the road beyond its originally designated northern terminus was a fundamental change from the original purpose of the company's incorporation and organization, to a participation in which the complainant could not be bound, against his consent, by the additional act of the legislature and the acceptance of it by a majority of the stockholders; and that he was therefore entitled to an injunction restraining the company from applying the funds obtained by them for the general purpose of their original creation, or the income of their road already built, towards building said extension or from using or pledging their credit for that purpose.

BILL IN CHANCERY, the nature and object of which are sufficiently stated in the opinion which was delivered by

BENNETT, Chancellor. This is a bill preferred before the chancellor of the third judicial circuit, against the Rutland and Burlington Railroad Company and three of its directors, by a stock holder in the company; the object of which is to obtain an injunction against the defendants, restraining them from applying the funds of the corporation, or pledging its credit for the purpose of constructing a railroad from Burlington, in the county of Chittenden, to Swanton, in the county of Franklin.

It appears that the legislature of this state, at their session in 1843, granted a charter of incorporation to divers individuals, and to their successors, for the purpose of building a railroad from some point in Burlington, through the counties of Addison, Rutland and Windsor or Windham, to some point on the west bank of the Connecticut river, under the name of the Champlain and Connecticut River Railroad Company. This name was subsequently changed by the legislature, to the Rutland and Burlington Railroad Company. The charter, among other things, provides that the capital stock of the company shall be one million of dollars, with the right in the corporation to increase it to an amount sufficient to complete said road, and furnish all necessary apparatus for conveyance. The company, after having procured some minor amendments to the charter, which it is not necessary to notice, caused the books

to be opened, the stock to be taken, and organized in due time, under the law, and have caused the road to be constructed, and it has for some time been in successful operation.  The plaintiff, upon opening the books, subscribed for five shares of the capital stock, has regularly páid his subscription, each share being one hundred dollars, and he has ever since been the owner of said shares.  After this road was constructed, and while in operation, the legislature of this state passed an additional act to authorize this corporation to extend their railroad, at any time within three years, from Burlington to Swanton, in the county of Franklin, it being a distance of about thirty miles.  This additional act also provides, that the corporation, in the construction of this extension, shall have all the rights and privileges, and be subject to all the liabilities contained in the original charter, and the previous supplementary acts.  The orator then proceeds to allege that the directors who are made parties to this bill, and without authority from the board of directors or from the corporation, and without any previous notice, and in bad faith, and for the purpose of prejudicing the interests of the shareholders, procured the legislature to pass this additional act of 1850, and have caused it to be accepted by the board of directors; and that the directors have caused a meeting of the stockholders to be called, to see if they will accept of this act, as an amendment of their charter; and that they threaten, if this act shall be accepted by a majority of the corporation, that they will proceed immediately in the construction of this extension, and for that purpose will apply the funds and pecuniary resources of the corporation, and pledge its credit, to whatever extent they shall find it necessary, to effect the object; and this too without the consent and against the will of the minority of the stockholders, and particularly of the orator, who alleges that he has not and will not consent to accept of said act of 1850, and construct said extension, and that he has, ever since the passage of the act, requested the defendants to desist from the same.

These are the material facts stated in the bill, which has been verified by affidavit.  No affidavits have been filed on the other side, and no application for a delay of the hearing, for the purpose of answering the bill; and since it has been pending before the chancellor, it appears the corporation, at a meeting previously

called for that purpose, have voted to accept of the act of 1850 as an amendment of their charter.

The question is, can the orator, upon such a state of facts, claim, at the hands of the chancellor, his injunction.

It is an admitted principle, that in partnerships, and joint stock associations, they cannot by a vote of the majority change or alter their fundamental articles of copartnership or association, against the will of the minority, however small, unless there is an express or implied provision in the articles themselves that they may do it. It is equally well settled, that a court of chancery will, upon the application of an individual member of a partnership, or joint stock association, restrain, by injunction, the majority from using the funds or pledging the credit of the partnership or association in a business not warranted, and not within the scope of their funda-. mental articles of agreement. Courts of equity treat such proceedings by a majority, *as a fraud* upon the other members, which they will neither sanction or permit. To prevent the commission of fraud, by injunction, has been one of the earliest and most appropriate heads of equity jurisdiction, as well as to relieve against it, when committed. It was upon this principle that Lord ELDON, when High Chancellor, upon the application of a humble individual member of a company, which had been organized for the purpose of carrying on a fire and life insurance business, restrained the company, by injunction, from embarking also in the marine insurance business; though the applicant had paid into the funds of the company only one hundred and fifty pounds as a deposite upon fifteen shares, and the company gotten up by the *Rothschilds* of England, and composed of. six or seven hundred individuals, with a capital of five millions sterling. See *Natusch* v. *Irving and others;* Gow on Part. Appendix, 576. The same principle was applied to a corporation by the Vice Chancellor, and by Lord Chancellor BROUGHAM, in the case of *Ware* v. *The Grand Junction Water Company*, 2 Rus. and Mylne, 461 S. C. 13 Cond. Ch. Rep. 126. The Vice Chancellor, upon the application of a single shareholder, restrained the corporation, not only from embarking their funds and credit in a matter beyond the provisions of their charter, but also from applying to parliament for a change

in the charter, which would warrant it. The change desired to be made in that case was, that the company might be enabled to get their supply of water by means of an aqueduct from the river Colne instead of the river Thames, as authorized to do under their original charter. Lord Brougham, on appeal, dissolved that part of the injunction, it is true, which restrained the company from applying to parliament for an alteration of the charter in the particular desired, but retained the residue of it. So in *Cunliff* v. *The Manchester and Bolton Canal Company*, 13 Cond. Equity Rep. 131. n. the Vice Chancellor restrained the corporation, upon the application of a shareholder, from applying to parliament for a change in their charter, to enable them to convert a portion of their canal into a railway, and from applying any of the corporate funds to the proposed object.

It was well conceded, in the argument on the defense, that if the corporation had been about to proceed to a construction of the contemplated extension without the act of 1850, it would have been a proper case for an injunction. The only question which can be open to debate is, as to what shall be the effect of the act of 1850, and a subsequent adoption of the act by the corporation, upon the individual rights of a shareholder who does not assent to its adoption? If bound by it, there is no equity in this bill. It is, and must be admitted, that the legislature has no constitutional power, unless it be reserved in the grant, to change or alter an act of incorporation without consent, and thereby cast upon the company new and additional obligations, or take from them rights guarantied under the original charter. And indeed this the legislature have not attempted to do. It is also equally true that it is a part of the law of corporations, that they act according to the voice of the majority. But it is to be remembered, that this is not a suit in which the plaintiff seeks to protect himself in any *corporate* right, but in his own *individual* right, growing out of the fact of his having become a corporator by his subscription and its payment, to the capital stock of the company. One of an aggregate corporation may contract with the company, as well as a third person; and the rights of the individual so contracting are no more distinct and independent in the one case than in the other. The plaintiff, by his subscription, assumed to pay to the corporation, and only

for the purpose specified in the charter, its amount, according to the assessments; and there was at the same time a TRUST created, and an implied assumption on the part of the corporation, to apply it to that object, and none other. The corporation also assumed upon themselves to account to this corporator for his share of the dividends, when this road should be completed and put in operation, and for his share of capital stock, though not *in numero.* The charter, in this case, gives to the state the right to purchase ~~out~~ the road of the corporation, after a given number of years, upon certain terms therein specified. The relation between each original shareholder and the corporation is the same. The obligation of the contract between the legislature and the corporation, after an acceptance of the charter, is no more sacred than that which is created between the corporation and the individual corporator. Does any one suppose the legislature could, without the consent of parties, absolve a corporator from liability on his subscription to the corporation, or modify it? and can they do the reverse of it?

It is conceded that there is a class of alterations in a charter, which the corporation may obtain and adopt, that would not so essentially change the contract as to absolve the corporator from his subscription, or give him a right to complain in a court of justice, in case he had previously paid it. Where the object of the modification or alteration of the charter is *auxiliary* to the original object of it, and designed to enable the corporation to carry into execution the very purpose of the original grant, with more facility and more beneficially than they otherwise could, the individual corporator cannot complain; and I should apprehend it would make no difference with the rights of a corporation, in such a case, though he could show that the charter, as amended, was less beneficial to the corporators than the original one would have been. The ground upon which such amendments bind the corporator, I deem to be his own consent. When he becomes a corporator by his signing for a portion of the capital stock, he in effect agrees to the by-laws, rules and votes of the company, and there is an *implied* assent, on his part, with the corporation, that they may apply for, and adopt such amendments as are within the scope, and designed to promote the execution of the original purpose; and he signs, and the corporation receive his

subscription, subject to such implied contingency; and if we regard it in the nature of a *license*, only, it would not alter the principle. Both parties having acted upon it, it would not be countermandable.

But suppose the object of the alteration is a *fundamental* change in the original purpose, and designed to superadd to it something which is beyond and aside of it; does the same principle apply? In the case of the *Union Lock and Canal Company* v. *Towne*, 1 N. H. 44, the company, under an act of the legislature of New Hampshire, passed December, 1808, were incorporated for *the purpose* of rendering the *Merrimack* river navigable from *Reed's Ferry* to *Amoskeag Falls;* and in this charter the company were authorized to purchase and hold real estate not exceeding six acres, and to exact and collect toll for a period of forty years only, at a rate not averaging more than twelve per cent. per annum on the capital stock invested. In June, 1809 (the 23d), the legislature passed an additional act, which took off all limitation as to the rate of toll and time of its duration, and authorized the company to purchase and hold real estate not exceeding one hundred acres. In 1812, the legislature passed another act, conferring the right upon J. L. Sullivan and others to lock *Cromwell Falls*, on the same river, which was a point not embraced within the termini of the act of 1808; but in other respects the acts were similar; and in this act, Sullivan and his associates were authorized to transfer the charter to the Union Locks and Canal Company, so as to be considered a mere addition to that charter. It was transferred and accepted in August, 1813. The act of June, 1809, was passed upon the petition of the corporation, and the defendant became a member of the corporation in that summer; but whether before or after the 23d day of June (the day of its passage), does not distinctly appear; though the court say, from the declaration it appears all the assessments were made after that date, and a part after the passage of the act of 1812 and the acceptance of it. It became material to pass upon the effect of both acts. The court, in a well considered opinion, given by Judge WOODBURY, held that each of the subsequent statutes created such a fundamental change in the original charter as to absolve the defendant from all liability for assessments made after the passage of the additional acts, there being no evidence to show that he had ever personally assented to them.

In the *Middlesex Turnpike Corporation* v. *Lock*, 8 Mass. 268, the court held that a variation and change in the course of the turnpike road, from that which was prescribed in the original charter, was such a fundamental alteration as to absolve the subscribers from the payment of assessments made after the amendment to the charter, upon a subscription for stock, made before. The supplementary act in that case was passed upon the application of the directors of the company, with the assent of the corporation, at a meeting duly called for that purpose, and the alteration proposed in the act, was in the course of the turnpike road from Bisket Bridge, in *Tyngsboro'*, to the Fork, in *Bedford*. The court say that the defendant was not bound by the application of the directors to the legislature for the alteration, nor by the consent of the corporation thereto; and that much fraud might be put in practice under a contrary decision. The court did not decide but what the corporation had still remaining in them the legal right to sell the shares in such a case; but it would be indeed an idle remedy, in a case where nothing had been paid, as in that. Besides, the purchaser would come in under the charter, as amended.

The case of *the same company* v. *Swan*, 10 Mass. 384, arose under the same charter, as amended, and was brought to recover assessments on Swan's subscription, made after the amendment. The case differed from the one in the 8th vol. in this: Swan was a director in the company, and joined in the application to the legislature for a change in the charter, and when it was claimed by the counsel, that that fact, in connection with the fact that he was officially concerned in making the road under the amended charter, was equivalent to an individual assent to the amendment, and bound him personally, the court say they cannot admit the soundness of the position. They say that in the promise upon which the action is brought, the defendant stands as an individual, and in the promise, referred himself to what the legislature had done, not to any probable subsequent grant; and that there is no express consent to the change, and none can be implied, for the defendant might have been controlled by the will of the majority, or if he concurred in the votes and proceedings of the corporation, it was as a corporator, not carrying with it his individual concurrence; and judgment was entered up for the defendant. It might per-

haps be thought that this was spinning rather fine; but we have no occasion to pass upon the soundness of the view taken in this particular. See also *the same plaintiff* v. *Walker*, 10 Mass. 390. I cannot see that the case of *Revere* v. *The Boston Copper Company*, 15 Pick. 351, 363, cited by the defendant's counsel, makes for them, but rather the reverse. The object of the suit was to recover an indemnity, which the plaintiff claimed he had sustained in consequence of the defendant's refusal to employ him, and pay him a salary agreeably to a special promise which he had made with them, which by its terms was limited to the time for which the corporation was established, provided the plaintiff should so long live, and continue to perform his part of the agreement. The plaintiff was a stockholder, and took charge of the business as the agent of the company. The business of the company proved unprofitable after a trial of more than four years, and a majority of the corporation voted to dissolve the company and wind up its concerns; and for that purpose appointed trustees, and assigned their effects. They also *discharged* the plaintiff from their service, and gave notice to the executive department of the government that they claimed no further interest in the charter. By the by-laws, the officers held their offices for one year, and until others were appointed. The court said the corporation was not dissolved; and that the plaintiff, though one of the corporation, was not bound by the vote of the majority. So far as an aggregate corporator, he might be bound, they say; but treating him as an *individual*, with *individual rights*, he was not bound by the majority vote. This is a strong case to show the distinction; and the plaintiff had his damages allowed him after he was discharged by the majority vote, by reason of the defendants' refusing to employ him.

The case of the *Hartford and New Haven Railroad Company* v. *Croswell*, 5 Hill 385, has an important bearing upon the one before us. The amendment in that case to the original charter, authorized the defendant to purchase, hold, and run upon the sound, steamboats, in connection with their railway, and gave the company, for that purpose, an increase of capital not exceeding two hundred thousand dollars. This seems to be nothing more or less, so far as principle is concerned, than an *extension* of the *terminus* of the road at New Haven, by steam power, on the railroad which the

God of nature has made, instead of a railroad by land, constructed by the art of man. This amendment was accepted both by the directors of the company and by the corporation convened for that purpose; and yet it was held that the alteration was *fundamental*, and absolved the defendant from all liability for the assessments on his stock; there being no evidence that the defendant had personally assented to an acceptance of the amendment. In that case the assessments were made, and had become payable, and had been demanded of the defendant, before the amendment of the charter. Ch. J. NELSON, in his opinion, lays down this general proposition, "that corporations can exercise no power over the corporators, beyond those conferred by the charter to which they have subscribed, except on the condition of their agreement or consent."

This is a sound proposition. The consent or assent may, however, be *implied* in a class of cases, as has already been stated, where the amendment is not regarded as *fundamental*, and can be brought within the scope of the original purpose of the association; and this is going to the very verge of the powers of the corporation. It is difficult, and would be unwise, to attempt to lay down any general rules to determine in what precise cases the assent of the corporator should be implied, and in what not. It is sufficient, for the present purpose to say, that his assent cannot be implied, in a case like the present, from a majority vote. Courts may differ, and doubtless will, in regard to what alterations shall be sufficient to constitute a fundamental change. But in the present case, I think, on this point there can be but one opinion. The *termini* of the road, as fixed by the charter, are Burlington, and some point on the west bank of Connecticut River, in the county of Windsor or Windham. The capital stock is one million of dollars, with a right in the corporation to increase it to an amount sufficient to complete said road, and furnish the necessary apparatus for conveyance. The supplementary act of 1850 purports to authorize the corporation, within three years, to construct and extend their railroad from the terminus in Burlington, to some point in Swanton, in the county of Franklin, a distance of about thirty miles; and the act provides that in the construction of the road, they shall have all the rights and privileges, and be subject to all the liabilities, contained in their original charter, and the acts in addition to it.

. The franchise granted to this company was territorial; and an extension of the termini necessarily is an extension of the franchise. It cannot remain the same thing in substance, until it can be established that a part is equal to the whole. Besides, the company may increase the capital stock to such additional sum as shall be necessary to construct the extension.

The statute of 1850 is little less in effect, if anything, than an attempt to create in a summary manner, and by the way of reference, a new corporation, and to transfer all the old corporators to it. If all the corporators had assented to this transfer, it was well enough. The change in the purpose was not more fundamental in the case from the 5th of Hill than in this. It is not necessary that the business should be changed in kind, to change the original purpose. If this is not a change in purpose, it would not be to extend the road in one direction to Canada line, and in the other to Massachusetts line; and there would be no limits to the control which the corporation might acquire over the individual corporators, and this, too, without their consent, except what arises from the confines of legislative authority.

The change, then, in the charter being *fundamental* and the corporation not being able to bind the plaintiff by a majority vote, what must be the result? If he had been sued for an assessment upon his stock, he might have claimed that he was absolved from all liability upon the acceptance of the amendment. And is not this reasonable? Shall it be said that the legislature and the corporation have power to embark this corporator in a speculation to which he has never consented? If it can be done in one case it can in another. But having paid his funds into the corporation, he has a right in chancery to compel a faithful performance of the *trust* by the corporation, in conformity to the original charter, and to keep them within its purview. No one can suppose, that upon the payment of his subscription, the personal identity of the plaintiff was merged in the corporation, or that he ceased to have distinct and independent rights. In *Rex* v. *Eastern Counties Railway Company*, 1 Railway Cases 509, the King's Bench issued a mandamus, upon the application of a minority, against the company, directing them to proceed in the construction of a railroad which had been chartered between two points, the corporation

having stopped short of one of the termini, and voted to go no further.

In the case before us, it must follow, if the plaintiff is not bound by the conjoined effect of the act of 1850, and a majority vote of the corporation, the defendants can stand on no better ground, than a voluntary association, who are about to go *beyond* and *aside* of their original articles, against the will of a minority. This, in effect, was conceded in the argument. There was nothing improper in the passage of the act of 1850, though upon the application of a portion of the directors of the company, as stated in the bill. No attempt is made by the legislature to impair the obligation of any contract between themselves and the corporation, or to cast upon the company any new and additional burthens without their consent. There was no attempt to impair any contract arising under the prior charter, between the corporation and the corporator as an individual, or disturb any vested right in either. The act is not *mandatory ;* and there is, in fact, an implied condition annexed to it, that it is to be accepted by all' whose individual and corporate interests are to be affected by it, before it shall become operative. But suppose this act had been *mandatory* upon the corporation and the several stockholders, to build this extension in the road within three years; would not all cry out against its palpable injustice? Suppose, instead of this, the legislature had left it optional with the corporation to accept or reject the act of 1850, and had provided, that in case of the acceptance of the amendment by the corporation, it should bind the corporators who dissented from it, or did not assent to it, and this, too, in their individual rights; would there not be the same reason to cry out against it? Would it not, by its carrying a stockholder into an enterprise which he had never consented to, and changing the principles of liability between the corporation and the individual corporator from what they were under the original compact, impair and disturb vested rights under it? I have no hesitation in saying, that, in my opinion, it would be beyond the pale of the constitutional authority of the legislature.

In *Ellis* v. *Marshall,* 2 Mass. 269, it was held that no man could be made, by act of legislation, a member of an aggregate corporation without his *personal* consent; and the same principle

would seem to apply when he is asked to remain and become a corporator under a supplementary act, to be attached to and become a part of the charter, where that which it is proposed to *superadd* is *vital*, and constitutes a *fundamental* change in the charter, which is but the constitution of the company.

The case of *Gray* v. *Monongahela Navigation Company* in Error, 2 Watts and Sergeant 150, has been much relied upon in the defense. The purpose of the incorporation, as specified in the grant, was to construct a lock navigation on the Monongahela river. In the charter it was provided that the company might raise their dams to a hight not exceeding four and one-half feet; and that no one stockholder should have to exceed ten votes. Some three years after the passage of the act a supplemental act was passed taking off the limitation as to the hight of the dams, and permitting them to be raised to a hight not exceeding eight feet, and providing that a share-holder of a given amount might have twenty votes. The plaintiff became a subscriber for stock soon after the charter was given, and the action was for certain installments. The alteration was at the request of the directors. It was claimed that the alteration changed a most essential feature in the original charter, and would absolve the defendant below from all obligation to pay his assessments. But the court held otherwise, and I do not know that I should differ from them. In regard to the provision in respect to a change in the ratio of votes, the answer given by the judge at the circuit, in his charge to the jury, would seem to be conclusive. He says, it was to correct a palpable blunder in the first act, which made the section obscure and contradictory; and if the alteration disturbed the obligation of the contract, the act was so far void, and the contract left in force. The provision enlarging the license as to the hight of the dams erected in the river, was evidently a furtherance of the object of the original grant, which was to construct a lock navigation. It might well be said that the corporation had an implied authority to obtain such an amendment to the original grant.

In this very case Ch. J. GIBSON says, if the amendment extended to a change in the structure of the association, it would have been fatal; and it was so held by that court in the *Indiana and Ebensburgh Turnpike Company* v. *Phillips*, 2 Penn. 184.

The change in the case of *Irvin* v. *The Turnpike Company*, 2 Penn. 466, was in the location of a part of the road. This was held, by three judges against two, not to be such an alteration of the grant as to be fatal; and that an acceptance of the amendment by the corporation would bind the individual corporators.

This case is opposed to the Massachusetts cases, and I am not called upon to say which I should be disposed to adopt. It is sufficient to say, that in the one case the court did not consider the alteration in the charter as a *fundamental* change in the structure of the association, while in the other it was so considered. And as this preliminary question is determined, so the result must follow. I apprehend neither the case of *Lincoln and Kennebec Bank* v. *Richardson*, 1 Greenl. 79, or of *Foster et als.* v. *The Essex Bank*, 16 Mass. 245, has any material bearing upon the question to show that the plaintiff was bound individually by the majority vote of this corporation. In these cases there had been a general law extending the charters of incorporated banks for a specified time, and only for the purpose of their closing up their business. This law was attacked, as unconstitutional, by the Essex Bank, when sued by a creditor, after the expiration of their original charter; and it was well held that the law only went to the remedy for existing rights, and in no possible way changed or varied the contract of any of the parties; and it was binding upon the corporation and the corporators, whether assented to or not.

The case of *Ware* v. *The Grand Junction Water Company*, 13 Cond. Chan. 126, has been relied upon to defeat the equity of this bill. The Vice Chancellor allowed a special injunction, in the terms of the prayer of the bill; the first branch of which restrained the company from making any application to parliament, or taking any other proceedings for obtaining such an alteration in the original charter, as was desired; and the second branch merely restrained them from carrying those alterations into execution, independently of such legislative sanction; or from using, or permitting to be used, the seal, name, funds, credit, and officers of the company, with a view to effect any such purpose, under their existing constitution. The Lord Chancellor supported the injunction of the Vice Chancellor, so far as related to all such acts as were not

authorized by the then present constitution of the company, but dissolved it, so far as to permit the company, as a *qua corporate body*, to apply to parliament for an alteration in their charter, so as to authorize the change desired; but restrained them from applying their corporate funds to that purpose. The Chancellor proceeded upon the ground, that it was an *incidental* right in the corporators, as a *qua corporation*, to apply for such a change; and that the plaintiff subscribed for stock, subject to such a contingency; and that all the arguments touching the proposed change, were proper for a committee of the House of Lords, or Commons. He evidently goes upon the ground that parliament is the proper place to meet the question; and that if parliament decide to make the alteration proposed, it is binding upon all the corporators. I apprehend, that the views expressed by the Lord Chancellor in that case, if sound, must rest upon one of two grounds; either that the change asked for in the charter was not a *fundamental* one, or else upon the ground of the *transcendent* powers of a British parliament. It is said by Lord COKE, " that the power and jurisdiction of parliament is so *transcendental and absolute*, that it cannot be controlled or confined, either for causes or persons, within any bounds;" and in Steph. Elec. Law, vol. 1, p. 11, the doctrine is maintained, that the statutes of the realm are binding upon all the subjects, unless they are repugnant to the laws of God; and that they can only be dispensed with by the same authority of parliament with which they were made. And, though other writers have maintained the ground that there are certain boundaries set to the exercise of even the supreme powers of a British parliament, yet it is not necessary particularly to consider this subject. It is evident that Lord BROUGHAM in the case of *Ware* v. *The Grand Junction Water Works*, grounds himself upon the *sovereign and uncontrollable* powers of the parliament. The change in the charter, asked for in that case, would, under most if not all the decisions in this country, be regarded as a *fundamental* one. The argument of Lord BROUGHAM, at least in one particular, does not seem very sound. He says, " the company ought to have the power of obtaining an alteration in their constitution, or that the plaintiff ought to have come in as a member of it, under certain *conditions* and *limitations*." But would the *conditions* and *limitations* be

more sacred than the constitution itself? and if parliament might change the *constitution*, might they not dispense with the *conditions* and *limitations*. See Amer. Law Mag. vol. 6, p. 93. But with us, no legislature can transcend the bounds of the constitution. It is not a constitutional tribunal, to hear and settle the rights of the parties, as Lord BROUGHAM seems to consider the British parliament. I apprehend, that in this state, no court of chancery would restrain a corporation from applying to the legislature for a fundamental change in their charter; and a sufficient reason would be, that if the additional power and authority changed the character of the original contract, and defeated the vested rights of the stockholders, the act would bind such of the stockholders only as consented to the alteration.

In the case of *Coleman* v. *Eastern Counties Railway Companies*, 10 Beavans' 1, the directors of the railway company, for the purpose of increasing their business, proposed to *guarantee* certain profits, and to secure the capital stock of an intended steam packet company, who were to act in connection with the railroad company; and it was held not to be within their power; and they were restrained by injunction, upon the application of a shareholder, even though it appeared that the shareholder was suing at the instigation of a rival company. The Master of the Rolls, Lord LANGDALE, says, " that such a circumstance, in itself, was not sufficient to prevent the orator from obtaining a special injunction, upon the merits of his case." In the recent case of *Munt* v. *The Shrewsbury and Chester Railway Company*, 3d vol. of English Rep. in Law and Equity, 144, the defendants, by various acts of parliament, were empowered to construct several railways, and also to build wharves and warehouses, for the purpose of the traffic of the company, upon the banks of the river *Dee*. The railway company brought a bill into parliament, to empower them to improve the navigation of the river *Dee* having no power to apply any of the capital of the company to that purpose, under the original charter. Upon the application of a single shareholder, it was held that the directors could not apply any of their funds in improving the navigation of the river *Dee*, or in payment of the expenses of getting a bill through parliament for that purpose; and an injunction was granted to restrain them from so doing. In that case, it was

a conceded fact, that the prosperity of the railway company depended materially upon the navigation of the river being kept in good condition, and that it was then in a state of deterioration; and the company had actually expended two thousand pounds upon the river, before the bill was brought. The Master of the Rolls says, "so far as the power of a court of chancery extends, it has *unalterably* decided that companies possessed of funds for objects which are distinctly defined by act of parliament cannot be allowed to apply them to any other purpose whatever, however beneficial or advantageous it may appear to be to the company, or to individual members of the company." The injunction not only stayed them from expending any further sums of money upon the river, but from applying to parliament for an alteration of the charter, at the expense of the corporation.

In the 13th of Eng. Cond. Rep. 132, we have a short note of a case following the note of the case of *Cunliff* v. *The Manchester and Bolton Canal Company*, in which it is said, that soon after the bill was filed by Cunliff, one Maudsley filed his bill against the same company, and for a *similar object;* and that the Vice Chancellor overruled a demurrer to this bill and that an answer was put in and, upon a hearing upon the merits, the bill was dismissed. What were the precise allegations in Maudsley's bill, cannot be ascertained from the note. All that is said is, that the bill was for a *similar* object as that of Cunliff. If the bill simply charged that the company were about to apply, as a *qua corporation*, to parliament, for an act to convert a portion of the canal into a railway, and that they threatened, when such act was obtained, to apply their funds in changing the canal into a railway, the demurrer, upon the authority of the case of *Ware* v. *Grand Junction Water Company*, was rightfully overruled. And if the answer not only denied the *intention* of the company to use any of the funds of the corporation, or their credit, to obtain the alteration in the charter, and also denied all intent to apply their funds to the making of such change until the new act was obtained, the bill should have been dismissed upon the doctrine of Lord BROUGHAM that the act when obtained would be binding upon all the shareholders. But if this would be so in England, I have attempted to show that it must be attributed to the uncontrollable power of their parlia-

37

ment, and that it could not be so under our constitution. If the bill alleged that the company were about, not only to affix the corporate seal to a petition to parliament, but also to use the corporate funds to defray the expenses of getting the new act passed, as well as in converting the canal into a railway, and all this was not denied in the answer, the bill, upon the whole current of the English cases, should have been retained.

The Rutland and Burlington Railroad Company is but a private corporation, so far as the stockholders are concerned; though as it regards the powers of the legislature to authorize the taking of private property for public use, it may be said to be a *qua* public corporation. The stock is owned by individuals who compose the corporation, and from which they design to derive a profit; and they manage the business in view to their own interest; and it' does not become a public corporation because the public interests may be incidentally promoted by it. In principle it is like a turnpike, a canal, or bridge charter; *Ten Eyck* v. *Delaware and Raritan Canal Company*, 3 Harr. (N. J.) 22. I think it is obvious beyond a reasonable doubt, upon principle and authority, that the plaintiff is not bound in his individual rights as a corporator, by force of the act of 1850 and the majority vote of the corporation, without his individual assent. In the case of public corporations, as in towns, counties, &c., a different rule may obtain. The distinction between private and public associations and corporations has been well settled since the days of Lord COKE. (Coke Little. 181, b.)

In case of public associations and corporations the *public good* requires that the voice of the majority should govern, and hence the power is more favorably expounded than when created for private purposes; and it would seem that *public convenience* required the adoption of such a rule. But in case of private associations and corporations it is not the doctrine that a majority can bind the minority in a matter *beyond* and *aside* of their original articles of association, or charter of incorporation, unless it be by special agreement giving such power, which must be a part of the original association.

If, in a case like the present, the majority cannot bind the minority, it is plain that there is an equity in this bill, and that the

defendants can stand in no better situation than if they had, by a vote of the company, proceeded to build the extension, and to apply the funds and credit of the corporation to that purpose, without any additional act of the legislature. The case of *Livingstone* v. *Lynch et al.*, 4 Johns. Ch. 573, was the case of a voluntary association under the name of the North River Steamboat Company; and a majority, without the consent of the minority, changed by a vote the articles of association, and proceeded in their business according to their new articles. The bill was brought by the plaintiff against the majority of the company to have the rights of the association reinstated on their former basis; and the chancellor decreed the new articles *null and void*, and set up the old articles, and enjoined all further proceedings under the new articles. In the case of *Natusch* v. *Irving et al.*, which was also the case of a voluntary association, an injunction was allowed to restrain them from going into a business not within the scope of the original articles, in pursuance of a vote of the majority. And in that case, before the hearing, the defendant had offered to pay back all that the orator had paid into the company, with interest from the date of the payment, and also to fully indemnify him against all loss by the transactions of the company already had or thereafter to be had in the business which was beyond their original articles. Lord ELDON to this part of the case replies, in substance, that it is not competent for any number of persons in a partnership (unless so provided for) formed for specified purposes, to effect that formation by calling upon some of their partners to receive back their capital stock and interest and quit the concern, which, in effect, would be merely *compelling* them to retire upon such terms as should be dictated to them, so as to form a *new company;* and that it is the *right* of a partner to hold his associates to the *specified purposes* whilst the partnership continues, and not to rest upon indemnities with respect to what he had not contracted to engage in; and that a partner cannot be compelled to part with his shares, though for double what he originally gave for them; and that it may be his principal reason for keeping them, to have the partnership carried on according to the original contract. This doctrine of Lord Chancellor ELDON necessarily grows out of the doctrine that it is the business of courts of justice to enforce the

contracts of parties, *not to make them.* To give to courts not only the power to enforce, but also the power to make, or even modify in one iota a contract fairly made, would be the *rankest despotism.*

I am not ready to suppose the directors in procuring the act of 1850 to be passed, or the corporation in accepting that act, acted in bad faith to any of the old stockholders; but doubtless they were governed by the most honorable motives and meant it for the best good of all concerned, notwithstanding the allegations in the bill. The case is not put at all upon the allegations in the bill imputing bad faith to the directors in obtaining the act of 1850. If it was, it would be very material to the merits of the question that the bill should be answered. The ground assumed is, that this corporation had the funds of the original stockholders for an object distinctly defined in the original charter, and that they cannot be allowed to apply them to any other purpose whatever, without the consent of the stockholders, and that to do it would be a breach of trust.

In regard to the expediency of bringing this bill, the chancellor cannot, and has no right to judge. The orator has the constitutional and sole right of determining this matter ; and if he thinks it expedient, we must acquiesce in it; and no plea of the public good or inequality of interests involved can justify the chancellor in denying to the orator a right which is clearly accorded to him by well established chancery principles. The public good is best promoted by an impartial administration of justice according to the right of the case; and courts cannot measure the equality or inequality of interests in the litigant parties and make that a basis for a decision, notwithstanding what has been urged in the argument.

Where it is clearly shown that a corporation is about to exceed its powers, and to apply their funds or credit to some object beyond their authority, it would, if the purpose of the corporation was carried out, constitute a breach of trust; and a court of equity cannot refuse to give relief by injunction. See *Aagar* v. *The Regent's Canal Company,* Cooper's Eq. 77 ; *The River Dan Navigation Company* v. *North Midland Railway Company,* 1 Railway Cases 153–4. The case from the 1st vol. of Railway Cases was before the Lord Chancellor, and he uses this language :

" If these companies go beyond the powers which the legislature has given them, and in a mistaken exercise of those powers interfere with the property of individuals, this court *is bound* to interfere ; and that was Lord ELDON's ground in *Aagar* v. *The Regent's Canal Company.*" The Lord Chancellor further adds : " I am not at liberty (even if I were in the least disposed, which I am not,) to withhold the jurisdiction of this court, as exercised in the case of *Aagar* v. *The Regent's Canal Company.*" In that case Lord ELDON proceeded simply on the ground that it was necessary to exercise this jurisdiction of chancery for the purpose of keeping these companies within the powers which the acts give them. And it is added, " and a most wholesome exercise of the jurisdiction it is; because, great as the powers necessarily are, to enable the companies to carry into effect works of this magnitude, it would be most prejudicial to the interests of all persons with whose property they interfere if there was not a jurisdiction continually open and ready to exercise its power to keep them within their legitimate limits." It cannot justify the chancellor in refusing to exercise the jurisdiction of chancery because the defendants may claim the right to proceed under color of the act of 1850. It is a settled principle that the circumstance of the defendant's acting under color of law, simply, can form no justification. The question, after all, will be: does the law justify the act which is being done, or threatened to be done ? *Osborn* v. *The Bank of the United States,* 9 Wheaton 738. If a law is unconstitutional it can give no authority. If the power it confers is abused, or exceeded, the person acting under the color of law is a wrong doer. In the case at bar the corporation had no power to build the *extension* under their original charter; and the act of 1850 is not binding upon the orator without his consent.

The injunction must therefore be allowed, but only so far as to restrain the defendants until the further order of the chancellor from applying the present funds of the corporation, or their income from their present road, either directly or indirectly to the purpose of building said extension in said road, or to pay land damages and other expenses which may be contingent upon the building of it ; and also from using or pledging, directly or indirectly, the credit of the corporation in effecting the object of the extension ; and at

the same time the company will be left at liberty to build the extension with any new funds which they may see fit to obtain for that specific object.

Though this is but an interlocutory decree, made upon the plaintiff's equitable rights as disclosed in the bill, still, it having been twice argued, and it being a case of considerable interest and importance, I have deemed it proper to publish, somewhat at length, the grounds of my opinion. "To err is human;" and if, upon more mature consideration, the conclusion of my own mind shall be found to be unsound, and not in accordance with principle and authority, I rejoice that they may be corrected by a superior tribunal.

After the above decision was announced, and before the injunction was issued, the defendants proposed to file bonds to indemnify the plaintiff against all damages which he might sustain by reason of the extension; upon which the chancellor suggested, that he did not deem it competent for him to make contracts for the parties; and that upon the authority of the case of *Natusch* v. *Irving et al.* it could make no difference, if filed, in the result.