Ervin and others *v.* Oregon Ry. & Nav. Co. and another.

*(Circuit Court, S. D. New York.* May 27, 1886.)

1. CORPORATION — STOCKHOLDERS — RELATION OF MAJORITY AND MINORITY — TRUST.

When a number of stockholders combine to constitute themselves a majority, in order to control the corporation as they see fit, they become, for all practical purposes, the corporation itself, and assume the trust relation of the corporation towards its stockholders; and, if they seek to make profit out of it at the expense of those whose rights are the same as their own, they are unfaithful to the relation they have assumed, and are guilty, at least, of constructive fraud.

2. SAME—SALE—DISSOLUTION.

Although the minority of the stockholders cannot complain because the majority have dissolved the corporation, and sold its property, they may justly complain where the majority, while occupying a fiduciary relation towards the minority, have exercised their powers in a way to buy the property for themselves, and exclude the minority from a fair participation in the fruits of the sale.

3. SAME—FOLLOWING TRUST FUND.

Under the rule of equity which entitles those whose property has been misapplied by an agent or fiduciary to follow it into any form in which it has been converted, and impress it with a trust whenever its identity can be traced, or, at their election, to recover the value of the property in any form into which it has been transmuted, where the majority of the stockholders merge the business and property of the corporation with other business and properties belonging to themselves and embark the whole in a joint venture and sell the corporation's property to themselves, the inquiry, in a question with the minority, is, what is the property worth to the purchasers as a constituent of their general properties?

4. SAME—EQUITABLE LIEN.

The minority of the stockholders have an equitable lien, to the extent of their interest, upon the property of the corporation which has been sold by the majority to themselves, in breach of their fiduciary relation.

5. SAME—ACTION—PARTIES.

Actors in the transaction by which the minority of the stockholders have suffered, are proper parties to suits at their instance.

In Equity.

*William Allen Butler* and *Thomas H. Hubbard,* for complainants.

*John F. Dillon* and *Artemus H. Holmes,* for defendants.

WALLACE, J. When this case was before this court on demurrer, (20 Fed. Rep. 577,) the questions of law arising upon the allegations of the bill were fully considered. It was then determined that, although the majority of stockholders of the Oregon Steam Navigation Company were authorized by the statutes of Oregon, under which the corporation was organized, to dissolve the corporation, dispose of its property, and divide the proceeds despite the opposition of the minority stockholders, and although the majority exercised this authority in the mode which the organic law of the corporation permitted, nevertheless they had no right to exercise their control over the corporate management for the purposes of appropriating the property or its avails to themselves, to the exclusion of a minority, or without rendering them a fair return.

v.27F.no.9—40

The case is now here upon the proofs, and the following facts appear:

At a meeting, regularly convened, of the stockholders of the Oregon Steam Navigation Company, on the thirty-first day of March, 1880, the sale and transfer of all the property and franchises of the corporation to the Oregon Railway & Navigation Company, and the dissolution of the first-named corporation, were authorized by a vote of a large majority of the shares into which the capital stock of that corporation was divided; and the directors were requested to take the necessary formal action for the purpose. The directors took action; the sale and transfer were concluded; the corporation received, as the purchase price, $2,300,000; the directors declared a final dividend of 46 cents on the dollar per share, payable only upon the surrender by stockholders of their certificates for cancellation; and the corporation was formally dissolved. This is the sale which is complained of. These proceedings were brought about chiefly by the instrumentality of the defendant Villard, who, early in the year 1879, conceived the scheme of amalgamating the properties of the Oregon Steam Navigation Company, the Oregon Steam-ship Company, and the Oregon & California Railroad Company, and consolidating them under one management, to control substantially the carrying business of Oregon and part of Washington Territory, which had theretofore been controlled by these transportation companies. In February, 1879, he formed a syndicate for the purchase of the property of the Oregon Steam-ship Company. This company, which was an Oregon corporation, then owned and operated a line of steam-ships plying between San Francisco and Puget sound, and other property appurtenant to its business. Its capital, which was originally $3,000,000, had been reduced to $1,000,000, and its $2,000,000 of outstanding mortgage bonds had been pledged for a loan of $1,200,000. The syndicate bought the franchises and property for $350,000, and took the assets of the company subject to a debt of $500,000, to which sum its creditors had consented to reduce their claims. Villard became its president.

At this time the Oregon Steam Navigation Company, also an Oregon corporation, owned and was operating a fleet of steam-boats, barges, wharf property, and real estate, by which it conducted a water transportation business on the Columbia, Snake, and Willamette rivers, in Oregon. It also controlled and operated two short portage railroads along the Columbia river, by means of which freight and passengers were transported at points at which the river was not navigable. It had a capital stock of $5,000,000, divided into 50,000 shares; it had no bonded debt; its properties and equipment were being constantly improved; and its financial condition was healthy and prosperous. Although, prior to 1878, its dividends had been irregular and small, its business had so largely increased that in that year it paid to its stockholders dividends amounting to 10½ per cent.

In May, 1879, Villard made a contract with one Ainsworth (who for several years had been buying up the stock of the Oregon Steam Navigation Company at low prices, and then owned or controlled a majority of the shares) to purchase of him a majority of the shares of the company, agreeing to organize a new corporation, with a capital stock of $6,000,000, which was to create its mortgage bonds for $6,000,000. By the contract between Villard and Ainsworth the new corporation was to acquire the property of the Oregon Steamship Company for $2,000,000 of its stock and bonds, and was also to acquire the property of the Oregon Steam Navigation Company for $6,500,000 of its stock and bonds, and Ainsworth was to receive, for the stock sold by him to Villard, 50 cents per dollar on its shares in cash, and 20 cents in bonds and 30 cents in stock of the new company at par. June 13, 1879, the new corporation contemplated by the agreement between Villard and Ainsworth was organized by the name of the Oregon Railway & Navigation Company, its articles of association being filed at that time pursuant to the laws of Oregon. The articles of association authorized the purchase of the property of the pre-existing corporations, and the stock of those companies. The new corporation created $6,000,000 of mortgage bonds, bearing 6 per cent. interest, and its capital stock was $6,000,000. June 27, 1879, the new corporation, by the action of its directors, set apart $2,000,000 of its bonds and stock, to acquire the property and pay the debts of the Oregon Steam-ship Company; also $3,557,000 of its bonds and $3,255,100 of its stock to acquire the stock of the Oregon Steam Navigation Company under the contract made between Villard and Ainsworth; and the next day Villard assigned that contract to the new company. Shortly afterwards the company acquired that stock, and July 7, 1879, credited Villard with the price of 40,712 shares of the stock, at $6,615,700, as against the bonds and shares which had been set apart. Subsequently the new corporation acquired 5,736 additional shares of stock of the Oregon Steam Navigation Company under an arrangement known as the "Harriott and Noyes contract."

Soon after the new corporation had acquired a majority of the stock of the Oregon Steam Navigation Company it assumed the management of the business of that company by the election of officers and directors, and the selection of agents, who were in its own interests. The Ainsworth party were identified in interest with Villard, and the syndicate which had organized the new corporation; and some of those who belonged to the combination began to represent the future prospects of the Oregon Steam Navigation Company as unfavorable, because its traffic would be depleted by a railroad about to be built by the new company. In the mean time they were purchasing such shares of stock as could be bought at satisfactory prices. During the first five months after the organization of the new corporation, commencing in July and ending December 1, 1879, the net earnings derived from its business operations were $699,864. Of

these earnings $559,650 were derived from the interest of the new company in the earnings of the Oregon Steam Navigation Company, including its appendage the Walla Walla & Columbia River Railroad Company. During the same period the total net earnings of the Oregon Steam Navigation Company, and including its share of those of the Walla Walla & Columbia River Railroad Company, were $687,807, while the earnings of the Oregon Steam-ship Company, the other constituent of the properties of the new corporation, during the same period, were $135,214.

In a report made by the president to the stockholders of the Oregon Railway & Navigation Company, of the date of January 3, 1880, it is stated that a former estimate made by Villard that the annual earnings of the several companies to be controlled by the new corporation would be sufficient to pay the interest on $6,000,000 of its mortgage bonds, and a dividend of 10 per cent. on $6,000,000 of its capital stock, "had been more than realized by the traffic of the half year just closed," and that the prospects of the company for 1880 were even more promising than the results of the last six months would indicate.

Early in February, 1880, the directors of the new corporation made a formal proposition to the directors of the Oregon Steam Navigation Company to purchase the property and franchises of that company at a valuation to be agreed upon between the two boards, or by two appraisers, one to be selected by each company. Thereupon the directors of the Oregon Steam Navigation Company adopted a resolution setting forth that the new company, being about to construct railroads which would render the most profitable part of the business of the Oregon Steam Navigation Company nearly worthless, and would greatly depreciate the value of its property, had made a proposition that was greatly to the advantage of the Oregon Steam Navigation Company, and that it was advisable that such proposition be accepted, subject to ratification at a stockholders' meeting; and it was accordingly resolved to accept the proposition, and one Brooks was appointed an appraiser on the part of the corporation. One Biles was selected by the new company as its appraiser. Within a few days the two appraisers agreed upon the valuation of $2,300,000. These proceedings were followed by the meeting of the stockholders of the Oregon Steam Navigation Company of March 31, 1880, at which the sale was ratified, and the dissolution of the corporation voted. At that meeting 40,552 shares were voted by the new company in the name of its trustee; 5,161 shares were voted in the names of Harriott and Noyes, being stock actually belonging to the new company; and 536 shares were voted by other persons in the interest of the new company.

At the time of the making of the Ainsworth contract, the property of the Oregon Steam Navigation Company was scheduled, as a basis for the purchase, at a valuation of $3,320,000, exclusive of the fran-

chise. No proposition was ever made by the defendants to the stockholders not in the combination with the Ainsworth and Villard parties, to allow them to come in on the same terms given to the Ainsworth parties. The original plan of Villard to acquire the property of the Oregon & California Railroad Company seems to have been abandoned, and, instead of acquiring this property, new railroads were projected and commenced by the new corporation. At the time of the sale the new company had expended about $2,100,000 in the construction of these new railroads, and upon the improvement of the property of the corporation generally.

This is a history, in outline, of the facts upon which the complainants rely. The bill contains the following allegations:

"And your orators aver and charge that the proceedings by which the defendant the Oregon Railway & Navigation Company has pretended to fix the value of your orators' stock at 46 cents on the dollar, and to end the rights of your orators to participate in the profits of said business, were a device and a sham, for the reason, among others, that, in making the pretended purchase of the Oregon Steam Navigation Company property, the Oregon Railway & Navigation Company was in fact both buyer and seller, and fixed the prices at which it bought, and for the reason that said price was grossly and fraudulently inadequate, and was fixed by means of a fraudulent scheme intended to apply to the minority of stockholders alone, of whom were your orators, and not to the majority stockholders, to-wit, said Oregon Railway & Navigation Company itself."

The proofs, which consist chiefly of the official records of the corporations, the reports and communications of their officers and agents, including those of Mr. Villard, and the oral testimony of Villard, and others person identified in interest with him, or with the corporation defendant, show very clearly that from the time of the organization of the Oregon Railway & Navigation Company it was the purpose of those who controlled it to absorb the Oregon Steam Navigation Company, and make the franchises, property, and traffic of that company a dominant factor—*First*, in floating the securities of the new corporation; and, *secondly*, in contributing to establish it permanently as a successful concern. They never contemplated winding up the business of the old company, and distributing the assets among its stockholders, otherwise than as a formal mode of doing what they could not do by legal sanction. What they intended to do, and what they practically did, was to effect a consolidation of the old company with the new, using as the means for the end the statutory power which authorized a majority of stockholders to dissolve the corporation, settle its business, and dispose of its property. This is manifest from Mr. Villard's statements, made in his report as president to the stockholders of the Oregon Railway & Navigation Company. This report presents a general review of the operations of the company for the year commencing July 1, 1879. He says:

"An important problem calling for solution by the management during the past year was the change in the relations of our company to the several corporations controlled by it from an indirect to a direct ownership. The

most direct mode of transforming the control into an actual ownership was the formal consolidation of the controlled companies with our own. As regards the Oregon Steam-ship Company our ownership of this entire stock rendered this an easy matter. But in the case of the Oregon Steam Navigation Company the fact that there was a minority of outstanding stock made a consolidation a more complicated transaction. Arrangements were first made to purchase for the company as much of the minority stock as could be obtained in the open market at reasonable prices. Finally it was decided, under the advice of counsel, to effect the object definitely, in accordance with the Oregon law, by the purchase of the property of the Oregon Steam Navigation Company for a proper consideration."

The plan of Villard and his coadjutors was practically accomplished early in July, 1879, when the new corporation acquired four-fifths of the stock of the old, and, by its officers and agents, assumed control of the affairs of the old company. It was then within the power of the new corporation to do at any time what was done by its vote at the meeting in the following March. It was expedient, however, in the interests of those who controlled the situation, to postpone decisive action until more of the outstanding shares of the old company could be acquired on terms satisfactory to the purchasers. But for all substantial purposes, from July, 1879, to the time of the dissolution, the franchises, property, and business of the old corporation were embarked in a joint venture with those of the new concern.

The defendants have adjusted their own interests on the basis of a consolidation of the two corporations and a continuance of their business as a joint venture; but they now insist that the interests of the minority stockholders, who have not been permitted to participate with them, shall be adjusted on the basis of a dissolution and a cessation of the business which they originally associated together to conduct. More than this, the defendants insist that the value of the assets, for the purpose of determining the interests of the minority, is fixed by the appraisal of persons selected by the defendants themselves, in whose selection the minority had no voice; and they have assumed to deny all recognition to those of the minority who will not consent to surrender their stock and accept a final dividend upon the basis of this appraisal.

Plainly, the defendants have assumed to exercise a power belonging to the majority, in order to secure personal profit for themselves, without regard to the interests of the minority. They repudiate the suggestion of fraud, and plant themselves upon their right as a majority to control the corporate interests according to their discretion. They err if they suppose that a court of equity will tolerate a discretion which does not consult the interests of the minority.

It cannot be denied that minority stockholders are bound hand and foot to the majority in all matters of legitimate administration of the corporate affairs; and the courts are powerless to redress many forms of oppression practiced upon the minority under the guise of legal sanction, which fall short of actual fraud. This is a consequence of·

the implied contract of association, by which it is agreed, in advance, that a majority shall bind the whole body as to all transactions within the scope of the corporate powers. But it is also of the essence of the contract that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those powers to pervert or destroy the original purposes of the corporators. *Livingston* v. *Lynch,* 4 Johns. Ch. 573; *Hutton* v. *Scarborough Cliff Co.,* 2 Drew. & S. 514; *Brewer* v. *Boston Theatre,* 104 Mass. 378; *Keane* v. *Johnson,* 9 N. J. Eq. 401; *Rollins* v. *Clay,* 33 Me. 132; *Clinch* v. *Financial Corp.,* 4 Ch. App. 117; *Clearwater* v. *Meredith,* 1 Wall. 25. It is for this reason that the majority cannot consolidate the corporation with another corporation, and impose responsibilities and hazards upon the minority not contemplated by the original enterprise, unless express statutory authority for this purpose is conferred upon the majority. It is no more repugnant to the purposes of the association to permit the majority to merge and consolidate the corporation with another corporation than it is to permit them to dissolve it, and abandon the enterprise for which it is created, when no reasons of expediency require this to be done. A dissolution under such circumstances is an abuse of the powers delegated to the majority. It is no less a wrong because accomplished by the agency of legal forms.

In the language of BLACKBURN, J., in *Taylor* v. *Chichester Ry. Co.,* L. R. 2 Exch. 379:

"As the shareholders are, in substance, partners in a trading corporation, the management of which is intrusted to the body corporate, a trust is, by implication, created in favor of the shareholders that the corporation will manage the corporate affairs, and apply the corporate funds, for the purpose of carrying out the original speculation."

When a number of stockholders combine to constitute themselves a majority in order to control the corporation as they see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders. Although stockholders are not partners, nor strictly tenants in common, they are the beneficial joint owners of the corporate property, having an interest and power of legal control in exact proportion to their respective amounts of stock. The corporation itself holds its property as a trust fund for the stockholders who have a joint interest in all its property and effects, and the relation between it and its several members is, for all practical purposes, that of trustee and *cestui que trust.* *Peabody* v. *Flint,* 6 Allen, 52, 56; *Hardy* v. *Metropolitan Land Co.,* L. R. 7 Ch. 427; *Stevens* v. *Rutland R. Co.,* 29 Vt. 550. When several persons have a common interest in property, equity will not allow one to appropriate it exclusively to himself, or to impair its value to the others. Community of interest involves mutual obligation. Persons occupying this relation towards each other are under an obligation to make the property or fund pro-

ductive of the most that can be obtained from it for all who are interested in it; and those who seek to make a profit out of it at the expense of those whose rights in it are the same as their own are unfaithful to the relation they have assumed, and are guilty, at least, of constructive fraud. *Jackson* v. *Ludeling,* 21 Wall. 616, 622; Story, Eq. § 323.

Among the disabilities imposed by courts of equity upon those who occupy a fiduciary relation towards others, respecting property which is to be administered for beneficiaries, is that which precludes the fiduciary from purchasing the property on his own account, without such a full and complete understanding, in advance, with the beneficiaries, as will repel all inferences that the fiduciary intended to derive any peculiar advantage for himself. The reason why this disability does not apply to a mere dry trustee is because his position gives him no vantage ground either of superior information or undue influence over the *cestui que trust.* *Parkes* v. *White,* 11 Ves. 226; Perry, Trusts, § 195. The rule is stated in Sugden on Vendors, (page 566, 13th Ed.,) as follows:

"It may be laid down as a general proposition that trusteees, * * * or any persons who, being employed or concerned in the affairs of another, have acquired a knowledge of the property, are incapable of purchasing the property except under the restrictions which will shortly be mentioned."

The fiduciary cannot retain his bargain by showing that the sale was public, or that the price was fair, or that there was no intention on his part to gain an unfair advantage. Where he has a duty to perform which is inconsistent with the character of a purchaser, he cannot divest himself of the equities of the beneficiaries to demand the profits that may arise from the transaction. *Greenlaw* v. *King,* 3 Beav. 49, 61; *Gibson* v. *Jeyes,* 6 Ves. 278; *Torrey* v. *Bank of Orleans,* 9 Paige, 663; *Michoud* v. *Girod,* 4 How. 555; *Gardner* v. *Ogden,* 22 N. Y. 327; *Hoyle* v. *Plattsburgh & M. R. Co.,* 54 N. Y. 314.

Applying these principles to the case in hand, although the minority of stockholders cannot complain merely because the majority have dissolved the corporation and sold its property, they may justly complain because the majority, while occupying a fiduciary relation towards the minority, have exercised their powers in a way to buy the property for themselves, and exclude the minority from a fair participation in the fruits of the sale. In the language of Mellish, L. J., in *Menier* v. *Hooper's Telegraph Works,* 9 Ch. App. Cas. 350, 354: "The majority cannot sell the assets of the company, and keep the consideration, but must allow the minority to have their share of any consideration which may come to them." The minority stockholders are therefore entitled to demand their fair share in the transaction, and to be placed upon terms of equality with the majority. It may be that the property of the old company was not worth more than the sum fixed by the appraisers, estimating its value with a view of the winding up of the corporation; but for several months the prop-

erty had been used by the defendants in a joint venture with the other property of the new corporation, and its value, at the time of the sale, should be estimated at what the property was worth as then situated. This results from the rule of equity which entitles those whose property has been misapplied by an agent or fiduciary to follow it into any form in which it has been converted, and impress it with a trust whenever its identity can be traced, or, at their election, to recover the value of the property in any form into which it has been transmuted. Story, Eq. §§ 1261, 1262. If it was worth much more as a constituent of the new corporation than it would have been worth otherwise, the minority stockholders are entitled to the benefit of the increase. The majority stockholders are not to be permitted to segregate it from the conditions in which they have placed it, for the purpose of fixing its value to the minority. For this reason the estimate made by the appraisers is not controlling, even if it is of any value in determining the price for which the defendants should account. This is so, not only because the appraisers were the agents of those who were at the same time negotiating as the purchasers and the sellers of the property, but also because they adopted a basis of valuation which will not be sanctioned by a court of equity. As the new corporation sold the property to itself, the inquiry is, what was the property worth to the purchaser as a constituent of its general properties?

It is difficult, if not impossible, to determine with precision what the property was worth as a component of the new corporation. When Villard bought the stock of the old company under the Ainsworth contract, he agreed to take it at the price of 50 cents on the dollar (par value) cash, and 50 cents in the securities of the new company. When the new corporation assumed this contract, and took an assignment of it from Villard, the stock actually cost the new company, by its arrangement with Villard, about 167 cents at par in its own stock and bonds. As the new company paid for this stock partly in its own securities, and the value of those securities was contingent upon the future success of the new company, it is not fair to assume that either of the defendants regarded the stock of the old company as worth the sum of 167 cents upon the dollar. They were willing to pay this price in the securities of a company which they expected would prove a financial success. But the transaction was a speculative one. It turned out, however, that, as soon as the defendants acquired control of the old company, and were able to merge its business with that of the new, whether the result was due to more efficient management, or to an unexpected development of traffic, or to circumstances quite independent of the new order of things, the new corporation became a financial success; and that the property and business of the old company was the factor of chief value in its prosperity. The new company immediately began to derive an income sufficient to pay the interest on its bonds and large dividends to its stockholders, and over three-fourths of this income

arose from its share of the earnings of the old company. Between the fall of 1879 and the spring of 1880 the stock of the new corporation, which had been listed in the mean time on the stock exchange, sold at prices ranging from 94 to 122.

If the minority stockholders had been offered the equivalent of the par value of their shares at any time before the results of the first five months of the business of the new company had been ascertained, it would seem that this would have been a favorable proposition in view of the past history of the old company. On the other hand, such an offer would have seemed inadequate if made after these results had been ascertained, as shown by the report of the operations of the new company to January 1, 1880, to its stockholders. At the time of the sale of March 31, 1880, the new company had expended, upon the construction of new railroads and the improvement of its property, about $2,100,000. It retained in its treasury at that time about $630,000 of its mortgage bonds, and about $659,000 of its unissued capital stock. The market price of its shares on the stock exchange is not a reliable criterion of the true value of its property. Indeed, the mortgage bonds of the company were being sold on the stock exchange, in March, 1880, at prices ranging between $92\frac{1}{2}$ and $94\frac{1}{2}$. But the exhibit of its earning capacity, and the cost of its constituent properties, together with the sums expended in their improvement, would indicate that the value of its property approximated within $2,000,000 or $3,000,000 the sum at which it had been capitalized. The proofs also indicate that the traffic of the new company was considerably larger than that which belonged, before the consolidation, to the old company and to the Oregon Steamship Company combined. Some of the lines of the new railroad which had been built by the new company would have diverted the traffic which would otherwise have accrued to the old company.

If it were practicable to ascertain accurately the value of the property of the old company, considering it as a component of the new corporation, the proper course would be to order a reference to a master; but there are so many elements of uncertainty in arriving at a just conclusion that it seems as well to determine the question now as to refer it for further proofs. In view of all the evidence, and without entering upon it in detail, the conclusion is reached that the value of the whole property of the new corporation, at the time of the sale, was from $9,000,000 to $10,000,000, and that of the old company should be fixed at the sum of $5,500,000, including the franchise. Upon this basis the complainant is entitled to a decree, with interest from the time of the sale.

The acts of Villard, although he was a director of the old company at the time of the sale, are not to be discriminated from the acts of the majority of the stockholders, of whom he was the representative. The circumstance that his position was more technically that of a trustee towards the minority stockholders than was that of the new

corporation, as the majority of stockholders, does not essentially alter or affect the rights of the parties. All that he did was sanctioned by the majority.

The complainants are adjudged to have an equitable lien, to the extent of the sum due them, upon the property of the old corporation now in the hands of the new corporation, prior to the lien of its stockholders, but not prior to the lien of the holders of its mortgage bonds. *Ferris* v. *Van Vechten,* 73 N. Y. 113. Villard is a proper party to the suit as one of the actors in the transaction by which the complainants have suffered. He cannot escape liability merely because his conduct has been sanctioned by the majority of stockholders.